851 F.2d 691
 Blue Sky L. Rep. P 72,762, 57 USLW 2116,
Fed. Sec. L. Rep. P 93,919
 John T. HILL, Descomp, Inc., Data Controls North, Inc.,
Virgil and Marie Scott, Thomas L. and Patricia A.
Ruger, and James R. Stritzinger, Appellants,
v.
The EQUITABLE TRUST COMPANY and Merchantile Safe Deposit &
Trust Company, Appellee.
 No. 87-3575.
 United States Court of Appeals,
Third Circuit.
 Argued March 7, 1988.
Submitted on Rebriefing May 6, 1988.
Decided July 14, 1988.
Rehearing and Rehearing En Banc Denied Aug. 4, 1988.
 
 Douglas Clark Hollmann (argued), Richard I. Kovelant, Goldman, Kovelant, Kruger, Hurtt, Hollmann & Kaiser, Laurel, Md., for appellants.
 Michael D. Colglazier (argued), Ty Cobb, Miles & Stockbridge, Baltimore, Md., for appellee.
 Before WEIS, GREENBERG and ALDISERT, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.*
 
 
 1
 The principal issue here is whether our in banc decision in In Re: Data Access Sys. Sec. Litig., 843 F.2d 1537 (3d Cir.1988), should be applied in this appeal from a judgment based on two earlier, inconsistent panel opinions of this court. Because plaintiffs had no reasonable basis for reliance on our then-existing precedent, we will apply the in banc holding retroactively. Although it adopted a different rationale, the district court reached the same ultimate result that our in banc ruling requires. Accordingly, we will affirm.
 
 
 2
 The district court entered summary judgment on several counts of a multi-claim complaint and, in accordance with the jury's answers to interrogatories, granted judgment for defendant on the remaining counts. Plaintiffs have appealed the judgments on some, but not all, counts.
 
 
 3
 This litigation is an outgrowth of the plaintiffs' unsuccessful investments in two limited partnerships. The factual background is complex, and the various legal issues have led to five published opinions by the district court. Hill v. Equitable Trust Co., 562 F. Supp. 1324 (D.Del.1983); Hill v. Equitable Bank, Nat'l Ass'n, 599 F. Supp. 1062 (D.Del.1984); Hill v. Equitable Bank, N.A., 642 F.Supp. 1013 (D.Del.1986); Hill v. Equitable Bank, 655 F. Supp. 631 (D.Del.1987), amended by separate opinion, 655 F. Supp. 653 (D.Del.1987).
 
 
 4
 The events relevant to this appeal, however, need only be summarized. In November 1977, plaintiffs John T. Hill, Thomas and Patricia Ruger, Virgil and Marie Scott, and Descomp, Inc. subscribed to purchase shares in Wilmington House. This limited partnership was organized under the laws of Maryland for the purpose of acquiring and renting a garden apartment complex in Wilmington, Delaware. Plaintiffs made cash down payments and, as security for subsequent installments, obtained irrevocable letters of credit from defendant, Equitable Trust Company of Baltimore, Maryland. A fire occurred a month after the partnership acquired the property, and Wilmington House suffered disastrous losses.
 
 
 5
 In November 1978, the Rugers, the Scotts, James Stritzinger, and Data Controls North, Inc. subscribed to shares in another limited partnership, Eagle Associates. This organization was formed as a resyndication of a West Virginia coal mining business. Before investing in this venture, plaintiffs met with Equitable officials who reported favorably on the mine's prospects. Only Stritzinger obtained financing through Equitable for his Eagle Associates investment; the others were unable to do so.
 
 
 6
 Like Wilmington House, the Eagle venture proved to be unprofitable. Later, plaintiffs learned that Equitable had extended substantial loans to the mining business' predecessor, had been engaged in litigation with the predecessor's limited partner, and had agreed to the company's restructuring as a means to retire outstanding debts to the bank.
 
 
 7
 Debilitatingly high partnership losses, along with indications of misrepresentations and kickbacks, led plaintiffs to suspect that they had been defrauded by Equitable employees working in collusion with Lee P. Der, the promoter of both investments. Suits were filed against Equitable in April 1982 in the United States District Court for the District of Delaware asserting claims under the Securities Act of 1933, 15 U.S.C. Secs. 77l, 77o, the Securities Exchange Act of 1934, 15 U.S.C. Secs. 78j, 78t, regulations of the Securities Exchange Commission, primarily Rule 10b-5, 18 C.F.R. Sec. 240. 10b-5, the federal RICO statute, 18 U.S.C. Secs. 1961-68, as well as counts under state law. Equitable counterclaimed for the amounts still owed by plaintiffs on their obligations to the bank.
 
 
 8
 As the litigation proceeded, a number of the counts were resolved and have not been included in this appeal. Plaintiffs have challenged, however, the district court's application of the statute of limitations to bar their claims under section 10(b) of the Securities Exchange Act and SEC Rule 10b-5.
 
 
 9
 Because the Exchange Act counts are not governed by a statutory limitations provision, the district judge, complying with this court's precedent, searched for the state law cause of action most analogous to the plaintiffs' claims. For the plaintiffs who were Delaware residents, the court ruled that the Delaware general fraud statute was most analogous to the plaintiffs' claims and appropriated that statute's three-year time limitation.[1] Hill I, 562 F. Supp. at 1337-39 (applying Del Code Ann. tit. 10, Sec. 8106) (1975).
 
 
 10
 For the other plaintiffs, who were not Delaware residents, the court decided that the Maryland Blue Sky law applied, providing for a maximum period of three years after sale or one year after discovery of the fraud, whichever came sooner. Id. at 1333-36 (applying Md. Corp. & Ass'ns Code Ann. Sec. 11-703(f)). Because more than three years had elapsed since plaintiffs subscribed to both the Wilmington House and Eagle Associates transactions, the court held that the section 10(b) and Rule 10b-5 claims were barred as to all non-Delaware residents. Hill V, 655 F. Supp. at 653.
 
 
 11
 The remaining counts proceeded to a jury trial. The jurors' responses to a comprehensive set of special interrogatories included a finding that plaintiffs had not exercised due diligence in investigating their claims. Based on that answer and others, the court entered judgment for defendant on the plaintiffs' outstanding claims. At the conclusion of a subsequent bench trial on the bank's counterclaim, judgment was entered in Equitable's favor.
 
 
 12
 Plaintiffs appeal the district court's selection of the proper statute of limitations to govern the section 10(b) and Rule 10b-5 claims, the entry of summary judgment on a Wilmington House count, and various evidentiary rulings at trial. We will discuss these issues in turn.
 
 I.
 THE STATUTE OF LIMITATIONS
 
 13
 The principal argument on appeal focuses on the applicable statute of limitations for the non-Delaware Eagle investors' section 10(b) and Rule 10b-5 claims. Plaintiffs argue that the district court erred in applying the Maryland Blue Sky statute of limitations in place of the Delaware general fraud law, or at least in rejecting their request for an equitable tolling of the Maryland statute.
 
 A.
 
 14
 In ascertaining the proper limitations period for the non-Delaware investors, the district court preliminarily consulted the borrowing statute of Delaware, the forum state. Hill I, 562 F. Supp. at 1333. As that statute applies to nonDelaware residents, the jurisdiction where the cause of action arose supplies the rule of decision on the statute of limitations. Del. Code Ann. tit. 10, Sec. 8121 (1975). Because the bank's alleged improper activity occurred in Maryland, the court concluded that the law of that state governed.
 
 
 15
 Maryland law offered two alternatives: its general fraud statute or its Blue Sky law. Not long before the present litigation began, the Court of Appeals for the Fourth Circuit reiterated its earlier holding that the statute of limitations found in the state's Blue Sky laws would apply to section 10(b) and Rule 10b-5 claims brought in the United States District Court in Maryland. See O'Hara v. Kovens, 625 F.2d 15, 18 (4th Cir.1980), cert. denied, 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981). Acknowledging that the purpose of the Delaware borrowing statute was to prevent forum shopping, see Pack v. Beech Aircraft Corp., 50 Del. 413, 132 A.2d 54, 57 (1957), the district court here followed the rationale of O'Hara and adopted the three years from sale/one year from discovery limitations period of the Maryland Blue Sky law.B.
 
 
 16
 Although the Exchange Act does not provide for a private cause of action under section 10(b), one has been judicially implied. Not surprisingly, the Act itself contains no limitations period governing such a lawsuit. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 210 n. 29, 96 S.Ct. 1375, 1389 n. 29, 47 L.Ed.2d 668 (1976). Nor has the Supreme Court yet determined the appropriate limitations time.
 
 
 17
 When the district court made its ruling here, this court's decisional law required application of the most analogous state limitations statute comporting with the policy behind section 10(b) and Rule 10b-5. Biggans v. Bache Halsey Stuart Shields, Inc., 638 F.2d 605 (3d Cir.1980); Roberts v. Magnetic Metals Co., 611 F.2d 450 (3d Cir.1979). Our precedents held that, depending on the circumstances of the dispute, we would refer to either a state's Blue Sky laws or its general fraud statute to determine the applicable statute of limitations.
 
 
 18
 After argument before the panel in this case, the entire court convened in banc in another appeal to again consider the proper limitations period for section 10(b) and Rule 10b-5 claims. In a comprehensive opinion written by Judge Aldisert, the court abandoned its previous precedents adopting analogous state statutes of repose. Instead, we found the most appropriate limitations statute for these cases in related provisions of the federal Securities Exchange Act. In Re: Data Access Sys. Sec. Litig., 843 F.2d 1537 (3d Cir.1988) (in banc). Accordingly, we adopted for section 10(b) and Rule 10b-5 cases a statute of limitations of "one year after the plaintiff discovers the facts constituting the violation, and in no event more than three years after such violation." Id. at 1550.
 
 
 19
 Although the judges of this court were unanimous that this federal statute of limitations should apply in section 10(b) and Rule 10b-5 cases, the majority specifically declined to decide whether its holding would be retroactive. Three dissenting judges maintained that, in conformity with the standards the Supreme Court set in Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the Data Access ruling should be made prospective only. This question, deferred in Data Access, must now be addressed.
 
 C.
 
 20
 We begin with the general rule that a controversy is to be decided on the law as it exists at the time the appellate court considers the case, although that law may differ from the one in force at the time the trial court decided the matter or at the time the events sparking the litigation occurred. Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 486 n. 16, 101 S.Ct. 2870, 2879 n. 16, 69 L.Ed.2d 784 (1981); United States v. The Schooner Peggy, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801). In effect, a court's decision by its nature acts retroactively, deciding the legality of actions which took place in the past. The jurisprudential theory underlying this phenomenon was explained by Blackstone, who wrote that the duty of a court is not to "pronounce a new law, but to maintain and expound the old one." 1 W. Blackstone, Commentaries *69.
 
 
 21
 Austinian philosophy, however, espouses a less metaphysical perspective of a court's decision making, contending that judges do, in fact, make law. Reflecting that view, the Supreme Court in Great Northern Ry. v. Sunburst Oil & Refining Co., 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932), rejected a constitutional challenge to a state court decision which applied a new rule of law prospectively only. A few years later, in Chicot County Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 374, 60 S.Ct. 317, 318, 84 L.Ed. 329 (1940), Chief Justice Hughes commented that the existence of a law before a determination of unconstitutionality is "an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration."
 
 
 22
 Two decades later, these conceptual observations were translated into a legal formulation. In Linkletter v. Walter, 381 U.S. 618, 629, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601 (1965), the Court explained that whether a ruling will apply only prospectively depends on a weighing of "the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation."
 
 
 23
 Although the strict Blackstonian approach is not an irrefutably correct statement of the proper judicial role, it remains true that the realm of prospective lawmaking is a traditionally legislative function and retroactive legal interpretation is historically a judicial task. As Professor Mishkin has written:
 
 
 24
 " 'the declaratory theory' expresses a symbolic concept of the judicial process on which much of courts' prestige and power depend. This is the strongly held and deeply felt belief that judges are bound by a body of fixed, overriding law, that they apply that law impersonally as well as impartially, that they exercise no individual choice and have no program of their own to advance. ... [T]he recognition of a need affirmatively to justify retroactivity, and certainly the announcement that 'the rule adopted today is to be effective only from this date forward' are inconsistent with the basic symbolic view of the judicial process."
 
 
 25
 Mishkin, The Supreme Court 1964 Term, Forward: The High Court, The Great Writ, and The Due Process of Time and Law, 79 Harv. L. Rev. 56, 62, 65 (1965), reprinted in R. Aldisert, The Judicial Process 905 (1976).
 
 
 26
 These conflicting jurisprudential theories may present a formidable intellectual armament for academic jousting over whether a given decision should be applied retroactively or only prospectively. Our task here is made somewhat less debatable by the Supreme Court's discussion in Chevron Oil Co. v. Huson. In that case, the Court was called upon to decide the applicability of a statute of limitations ruling that had been handed down after the plaintiff's suit had begun. Under the law in force on the date of filing, the plaintiff's complaint had been timely. If applied prospectively only, the later decision shortening the limitations period would not effect on the plaintiff's case; if applied retroactively, the ruling would have barred the suit as untimely.
 
 
 27
 Confronting this choice in Chevron, the Court set out three qualifications for making a decision prospective only:
 
 
 28
 (1) The holding must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed;
 
 
 29
 (2) The merits and demerits in each case must be weighed by looking to the history of the rule in dispute, its purpose and effect, and whether retrospective operation will further or retard the rule's operation;
 
 
 30
 (3) Retrospective application must create the risk of producing substantially inequitable results.
 
 
 31
 Chevron Oil Co., 404 U.S. at 106-07, 92 S.Ct. at 355.
 
 
 32
 We have applied these criteria in a number of cases where the statute of limitations was at issue. In Fitzgerald v. Larsen, 769 F.2d 160 (3d Cir.1985), and Smith v. City of Pittsburgh, 764 F.2d 188 (3d Cir.), cert. denied, 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985), we refused to treat as prospective only the ruling of the Supreme Court in Wilson v. Garcia, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), which applied uniform personal injury limitations in section 1983 civil rights cases. In Smith and Fitzgerald, we concluded that, because a definitive ruling by this court on the appropriate limitations period was lacking at time the complaints were filed, those plaintiffs could not justify their delay in bringing suit.
 
 
 33
 Prior precedent, we wrote, must be "sufficiently clear that a plaintiff could have reasonably relied upon it in delaying suit, a criteria that was not met where the law was erratic and inconsistent." Fitzgerald, 769 F.2d at 103. Cf. Al-Khazraji v. St. Francis College, 784 F.2d 505 (3d Cir.1986) (clear precedent gave plaintiff right to rely on statute of limitations established by case law prior to time complaint was filed), aff'd, --- U.S. ----, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987). Accord Brown v. Foley, 10 F.2d 55 (3d Cir.1987); Pratt v. Thornburgh, 807 F.2d 355 (3d Cir.1986), cert. denied, --- U.S. ----, 108 S.Ct. 125, 98 L.Ed.2d 83 (1987).
 
 
 34
 In the present litigation, at least two of the three Chevron factors counsel in favor of the general presumption of retroactivity and against the uncommon exception of prospectivity. In their answers to the special interrogatories, the jury found that plaintiffs were aware as early as June 1979 of the possibility of claims in connection with the Eagle Associate investments they had purchased in November 1978. Yet, the suit against Equitable was not filed until April 1982. Two dates, therefore, may be pertinent: June 1979 and April 1982. We must examine the state of the law at those times to determine whether precedent existed on which plaintiffs reasonably could have relied.
 
 
 35
 On November 14, 1979 we filed our opinion in Roberts v. Magnetic Metals Co., 611 F.2d 450 (3d Cir.1979), a case of first impression in our court addressing the proper limitations period for section 10(b) and Rule 10b-5 cases. That decision came five months after the date the jury found plaintiffs should have discovered the potential for fraud claims. Each of the three panel members in Roberts wrote a thoughtful opinion. The majority, although differing on rationale, applied the state general fraud statute. Id. at 456. The dissenting opinion, drawing a comparison to the federal securities acts, would have applied the shorter period incorporated in the state's Blue Sky law. Id. at 463 (Seitz, J., dissenting).
 
 
 36
 The next year, we decided a similar case, Biggans v. Bache Halsey Stuart Shields, Inc., 638 F.2d 605 (3d Cir.1980) (filed Dec. 31, 1980), with the panel again split. The two judges who had formed the majority in Roberts opted for the state general fraud statute; the dissent selected the state Blue Sky law as a closer analogy.
 
 
 37
 In sum, before we filed our first opinion on this question in November 1979, plaintiffs could not reasonably have relied on any ruling of this court setting out the appropriate section 10(b) and Rule 10b-5 statute of limitations. By the end of 1980, four judges from this court had considered the issue; two would have applied the state general fraud laws and two would have used the Blue Sky statutes. Consequently, the law in the circuit on this point could fairly be described as uncertain.
 
 
 38
 In 1981, the present plaintiffs brought suit against the promoter of the Wilmington House and Eagle Associates investments. See Hill v. Der, 521 F. Supp. 1370 (D. Del. 1981). There, Chief Judge Latchum confronted a statute of limitations defense to the section 10(b) and Rule 10b-5 claims. After reviewing the opinions in Roberts and Biggans, he wrote: "Because of the narrow ground upon which both Roberts and Biggans were decided and the lack of a firm consensus as to the proper guidelines to be applied, it is difficult to predict what effect these opinions hold for the circumstances posed by the present complaint." Id. at 1382-83. Ultimately, Judge Latchum found those two cases distinguishable and used the Delaware Blue Sky law to fix the proper Rule 10b-5 limitations period.
 
 
 39
 The Der opinion was filed on September 17, 1981. Its painstaking review of our limitations cases placed these very plaintiffs on notice that, at least as of their filing date, the law in the circuit on this issue was in ferment. Although the majority opinions in Biggans and Roberts were precedential, the factual situations in each case left considerable room for variation as Der demonstrated. Clear holdings on which plaintiffs could reasonably rely, as in Al-Khazraji and its progeny, were absent when plaintiffs decided to begin this suit in 1982.
 
 
 40
 If we look to the earlier date--June 1979--when plaintiffs should have learned of facts pointing toward a claim for fraud, our precedent was even less settled. Only Roberts had been decided by that time, and it provided no controlling authority on which plaintiffs reasonably could have relied in view of the factual distinctions here.
 
 
 41
 Although the in banc holding in Data Access shifted our focus from the comparable state statutes to analogous federal law, the policies inherent in the federal limitations period were alluded to in the dissenting opinions in both Roberts and Biggans. Data Access represented a significant development in section 10(b) limitations, but the resolution in that case was not completely "an issue of first impression whose resolution was not clearly foreshadowed." Chevron Oil Co., 404 U.S. at 106, 92 S.Ct. at 355. Neither are we convinced that Data Access signaled an abrupt change in clearly established law, as our survey of Roberts and Biggans reveals. Thus, we cannot say that the first of the Chevron criteria is satisfied here.
 
 
 42
 We may assume on these facts, as we did in Al-Khazraji, 784 F.2d at 513, and Fitzgerald, 769 F.2d at 164, that resolution of the second Chevron criteria--whether retrospective operation would further or retard the rule's function--is neutral.
 
 
 43
 The third criteria, whether retroactivity would produce substantial inequitable results, proves to be the plaintiffs' weakest position. We concluded in Data Access that the appropriate period of limitations for section 10(b) and Rule 10b-5 cases was one year after discovery, with a maximum outside limit of three years from date of purchase. Data Access, 843 F.2d at 1550. This limitations period is identical to the statutory provision adopted by the district court under section 11-703(f) of the Maryland Corporation and Associations Article. See Hill I, 562 F.Supp. at 1336. Thus, plaintiffs fare the same whether our new Data Access holding or the Maryland statute applies.
 
 
 44
 Moreover, in light of the precedent existing at the time of its ruling, the district court did not err in reasoning that Delaware's borrowing statute mandated application in this lawsuit of the Fourth Circuit decision. Before the district judge could decide which state statute was most analogous to the federal cause of action, it was necessary to make the threshold determination of which state's law should be reviewed. The judge properly resolved this preliminary issue by referring to the forum state's borrowing statute. See Cope v. Anderson, 331 U.S. 461, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947). That reference led the search to Maryland, a development that should have come as no surprise to plaintiffs, just as the choice of that state's Blue Sky law should not have been unexpected.
 
 
 45
 The Court of Appeals for the Fourth Circuit had applied this same Maryland limitations period in 1976 to an action brought under section 10(b) and Rule 10b-5 of the federal securities law.[2] See Fox v. Kane-Miller Corp., 542 F.2d 915, 917 (4th Cir.1976). Confronted with that published opinion, plaintiffs cannot credibly assert inequitable treatment. They were obviously on notice of the time period adopted by the Court of Appeals for the Fourth Circuit years before the cause of action in this case had accrued.
 
 
 46
 Although in Data Access we traveled by a different road than the district court did here, application of our in banc holding leads to the same destination. Under either approach, the effect on plaintiffs is the same.
 
 
 47
 This case illustrates some of the dilemmas eliminated by Data Access. Because the period of repose is now to be found in the federal securities statute, there no longer is any need to consult local borrowing statutes before beginning the color-matching our earlier decisions required. The facts here also demonstrate the inequity that can result when differing limitation periods are applied depending on the plaintiff's state of residence. Here, all plaintiffs asserted identical claims under the same federal act, yet the non-Delaware plaintiffs were barred from recovery by a period of limitations shorter than the one binding the Delaware residents, who were favored by their own state's borrowing statute.
 
 
 48
 Plaintiffs have failed to convince us that application of Data Access to this case would be contrary to Chevron's limited non-retrospectivity exception. Accordingly, we will affirm the judgments of the district court on the statute of limitations issue.
 
 II.
 SUMMARY JUDGMENT
 
 49
 Although the statute of limitations ruling resolves most of the claims raised by plaintiffs on this appeal, some common law contentions remain. Those plaintiffs who subscribed to the Wilmington House investment complain that the bank violated its duty to properly supervise its employees. Plaintiffs argue that a bank vice president, Stephen Meszaros, was friendly with Lee Der, the promoter, and had received various gifts in return for his cooperation in the scheme.
 
 
 50
 The district court granted the bank's motion for summary judgment on this claim. The court found no evidence of any causal relationship between the alleged dereliction by the bank and the plaintiffs' decisions to invest in Wilmington House. Hill IV, 655 F.Supp. at 645-46.
 
 
 51
 Before investing in Wilmington House, plaintiffs had no contact with the bank, and its advice was neither solicited nor volunteered. The only role of the bank in the transaction was its issuance of letters of credit guaranteeing future installment payments. The financing arrangements were not made by plaintiffs, but rather were arranged with the bank through Der. The undertaking, in effect, was equivalent to a loan. As the district court concluded: "Plaintiffs have not demonstrated that a bank is under a duty to insure that an investment is sound before loaning money to a customer on that investment." Id. at 646.
 
 
 52
 Plaintiffs rely on Jacques v. First Nat'l Bank, 307 Md. 527, 515 A.2d 756 (1986), a case which is readily distinguishable. The Maryland Court of Appeals held in Jacques that a contractual relationship existed between a bank and its customer. The court found it decisive that the bank, in exchange for a loan application fee, had agreed to lock the customer into a particular interest rate and to fairly process his loan application. Those commitments, reasoned the court, created a duty on the part of the bank to exercise reasonable care in processing the loan. No such relationship existed here.
 
 
 53
 We will affirm the district court's entry of summary judgment on the Wilmington House investment claims.
 
 III.
 THE EVIDENTIARY RULINGS
 
 54
 The Eagle Associates investors argue that the trial court improperly excluded evidence which, they assert, tended to show that the bank participated in the fraud either directly by selling partnership interests or indirectly by engaging in a conspiracy with the promoter. We review the district court's evidentiary rulings under an abuse of discretion standard. Salas v. Wang, 846 F.2d 897 (3d Cir.1988).
 
 
 55
 Plaintiffs first allege that the bank's vice president Meszaros and his successor, R. Kenneth Rous, had close ties with Der. Until he left the bank in September 1978 to join Der's business, Meszaros was personally responsible for Der's account with the bank. Additionally, Der testified that he and Meszaros had taken trips together. But the trial judge refused to admit further evidence that Der had paid for the trips, that he had consented to judgments in excess of $1 million dollars being entered against him by the Bank in November 1982, and that the bank had forced him into bankruptcy in March 1983.
 
 
 56
 Much of this evidence was irrelevant, relating to events which occurred years after plaintiffs made their investments. To a large extent, the evidence was also cumulative. Equitable's president testified that Meszaros and Der had been friends since their school days, that they had vacationed together for three or four years, and that Meszaros had been terminated because he had become too close to some of his customers. One of the plaintiffs testified that "the bank had Mr. Der in bankruptcy." Even if it were established that the plaintiffs' additional evidence had been improperly excluded, we believe that the district court's refusal to admit the evidence would have been harmless error in light of the other testimony of record establishing much the same factual scenario.
 
 
 57
 Plaintiffs next contend that the district court erred in refusing to admit internal publications describing the bank's personnel procedures. Plaintiffs offered these exhibits to prove the bank's negligent supervision of its employees. The court refused to admit the documents on the ground that portions of the material was unduly prejudicial. We find that this ruling was within the trial court's discretion.
 
 
 58
 Finally, plaintiffs argue that the district court improperly frustrated their efforts to prove to the jury that they had exercised due diligence in investigating their claims. In this connection, plaintiffs offered letters they had written in 1981 to both Equitable and state banking regulators. Viewing many of the letters as self-serving, the district court admitted only a portion of this correspondence--in a redacted form--while excluding numerous similar documents. These letters were, in large measure, cumulative of other evidence. The ruling was not an abuse of discretion.
 
 
 59
 We will affirm the judgments of the district court.
 
 
 
 *
 At the time of oral argument on this case, the Honorable Joseph F. Weis, Jr., was an active circuit judge. Since that time, Judge Weis has assumed senior status
 
 
 [1]
 The court referred to the Delaware borrowing statute which provides:
 "Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action. Where the cause of action originally accrued in favor of a person who at the time of such accrual was a resident of this State, the time limited by the law of this State shall apply."
 Del.Code Ann. tit. 10, Sec. 8121 (1975). This statute does not permit the borrowing of another jurisdiction's limitations period for Delaware residents. Thus, the court held that Delaware residents James T. Hill and Descomp, Inc. were entitled to the state's general fraud three-year limitations statute. Hill v. Equitable Trust Co., 562 F.Supp. 1324, 1337-39 (D.Del.1983). The court also ruled that the three-year Delaware general fraud statute had been equitably tolled; for that reason, the claims of the Delaware residents were timely. Hill v. Equitable Bank, 655 F.Supp. 631, 644 (D.Del.1987).
 
 
 [2]
 In O'Hara, the Court of Appeals distinguished Roberts because unlike our case, Maryland's Blue Sky law did provide protection for sellers. O'Hara, 625 F.2d at 18 n. 3