**TCF BANKING AND SAVINGS, F.A., Plaintiff,**

v.

**ARTHUR YOUNG & COMPANY, Defendant.**

Civ. No. 4–87–809.

United States District Court,
D. Minnesota,
Fourth Division.

Oct. 13, 1988.

Frank A. Dvorak, Stephen P. Kelley and Thomas C. Power, Mackall, Crounse & Moore, Minneapolis, Minn. (Gregory J. Pulles, TCF Banking & Sav., F.A., Corporate Banking, Minneapolis, Minn., of counsel), for plaintiff.

James S. Simonson, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., and John Matson, Arthur Young, New York City, for defendant.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

In an order dated April 13, 1988, the Court rejected the argument of defendant

Arthur Young & Co. that existing precedent concerning the statute of limitations for actions under section 10(b) of the 1934 Exchange Act and Rule 10b–5 should be disregarded in light of *Agency Holding Corp. v. Malley–Duff & Associates, Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The United States Court of Appeals for the Third Circuit, sitting *en banc,* has recently decided that the reasoning in *Malley–Duff* applies to section 10(b) and Rule 10b–5 claims. *In re Data Access Systems Securities Litigation,* 843 F.2d 1537 (3d Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988). On the strength of that opinion, Arthur Young returns to this Court for reconsideration of its argument. Arthur Young moves for dismissal of plaintiff TCF's section 10(b) and Rule 10b–5 claim as barred by the statute of limitations or, in the alternative, for certification permitting interlocutory appeal.

FACTS

Plaintiff TCF Banking and Savings, F.A. (TCF) is a savings and loan association based in Minnesota and chartered under federal law. Defendant Arthur Young & Co. is a professional partnership of certified public accountants. In August 1984, TCF was asked by Midwest Federal Savings & Loan Association (Midwest) to participate in a $16.9 million loan to Lewis Farris, Jr. and Clint Murchison, Jr. The sole security for the loan was stock owned by Farris and Murchison in Nevada National Bancorporation (NNBC), a one-bank holding company. Prior to agreeing to participate in the loan, TCF obtained the 1983 annual report of NNBC. The report "included a consolidated balance sheet, consolidated statements of operations, stockholders' equity, and changes in financial positions," and incorporated financial information of the Nevada National Bank, a wholly-owned subsidiary of NNBC. Amended Complaint par. 13. Defendant Arthur Young had prepared the 1983 annual report together with accompanying notes and an audit report. Amended Complaint par. 14. TCF alleges that it decided to participate in the Farris–Murchison loan agreement in reliance on the materials prepared by Arthur Young. Amended Complaint par. 12.

On September 14, 1984, TCF extended credit in the amount of $11.4 million to Farris and Murchison; Midwest advanced an additional $5.5 million. Farris pledged 810,314 shares of NNBC stock as collateral for the entire loan and Murchison pledged an additional 732,242 shares. Under the terms of the loan agreement the principal was payable upon demand and interest was due quarterly. By December 31, 1984 Farris and Murchison were in default because of their failure to pay interest. Amended Complaint par. 34. However, TCF and Midwest apparently attempted to work out a new payment schedule and did not immediately foreclose on the stock. When the work-out negotiations failed, they foreclosed.

At a private sale on March 25, 1986, TCF and Midwest purchased the 810,314 shares pledged by Farris at a price of $11.11 per share for a total purchase price of $9,002,589. On April 18, 1986 at a second private sale they purchased the 732,242 shares of NNBC stock pledged by Murchison again at $11.11 per share, for a total price of $8,135,209. TCF contends the purchase price of $11.11 per share was determined in reliance on the 1983 and 1984 annual reports of NNBC prepared by defendant. Amended Complaint par. 39. TCF and Midwest applied the combined purchase price of the stock to the outstanding amount of the loan obligation, resulting in cancellation of the principal indebtedness but leaving an amount of $2,470,356 due and owing as interest. In June 1987, TCF and Midwest sold the stock they had foreclosed upon at a price of $7.04 per share, for a total amount of $10,859,594, a loss of $6,278,117 from the original foreclosure price. TCF alleges that, during or after April 1986, it learned that the 1983, 1984 and 1985 annual reports of NNBC were all materially misleading. This litigation ensued.

TCF's complaint advanced causes of action under section 10(b) of the Securities

Exchange Act of 1934 and Rule 10b–5 (hereinafter referred to as the section 10(b) claim), the Minnesota Uniform Securities Act, common law negligence, common law fraud, and common law malpractice. Each of these claims was premised on an assertion that the 1983, 1984 and 1985[1] annual reports were materially false and misleading. Arthur Young moved to dismiss TCF's complaint for failure to state a claim.

■ On April 13, 1988, Arthur Young's motion was granted in part and denied in part. One aspect of the Court's decision concerned the statute of limitations on TCF's section 10(b) claim. Current law, then and now, in the Eighth Circuit applies a limitations period to section 10(b) borrowed from the state statute most closely analogous to section 10(b). *Vanderboom v. Sexton*, 422 F.2d 1233, 1237–38 (8th Cir.), *cert. denied*, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970). Where Minnesota is the forum state, the appropriate statute of limitations is the three-year limitations period of Minn.Stat. § 80A.23, subd. 7. *Appelbaum v. Ceres Land Co.*, 546 F.Supp. 17, 19 (D.Minn.1981), *aff'd* 687 F.2d 261 (8th Cir. 1982). Arthur Young, however, argued that the reasoning in *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), where the limitations period in civil RICO actions was determined by reference to a federal, not state, statute, should also apply to claims under section 10(b). The Court rejected Arthur Young's argument, stating that "[a]lthough the reasoning of the *Malley–Duff* decision may well be applicable here, nowhere did the *Malley–Duff* Court intimate that lower federal courts should extend its ruling to claims under section 10(b) of the 1934 Securities Act." Order of April 13, 1988 at 15.

Since the Court's decision, the Third Circuit, sitting *en banc*, has applied the reasoning in *Malley–Duff* to section 10(b). *In re Data Access Systems Securities Litigation*, 843 F.2d 1537 (3d Cir.1988), *cert. denied*, ___ U.S. ___, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988). *Data Access* holds that the statute of limitations for 10(b) claims is the limitations period applicable to provisions of the Securities Exchange Act of 1934, rather than that applicable to any analogous state law.[2] This conclusion is precisely what Arthur Young had urged on this Court. With *Data Access* in hand, Arthur Young now asks the Court to revisit the issue.

## DISCUSSION

### The Malley–Duff Decision

*Malley–Duff* decided the appropriate statute of limitations for civil RICO actions. The Court began its analysis by noting that, whenever a federal statute is silent on the proper limitations period, the federal courts generally apply the limitations period of the most analogous state statute. 107 S.Ct. at 2762. However, in some cases, the Court pointed out that limitations periods have been borrowed from another federal statute which "clearly provide[d] a closer analogy than available state statutes," and which was "a significantly more appropriate vehicle for interstitial lawmaking" given the federal policies at stake and the practicalities of litigation. 107 S.Ct. at 2763, *quoting DelCostello v. Teamsters*, 462 U.S. 151, 171–72, 103 S.Ct. 2281, 2294–95, 76 L.Ed.2d 476 (1983). The Court found that the law regarding the statute of limitations for civil RICO claims was "confused, inconsistent, and unpredictable." 107 S.Ct. at 2763, *quoting Report of the Ad Hoc Civil RICO Task Force of the ABA Section of Corporation, Banking and Business Law*, 391 (1985). Racketeering was a concept unknown to the common law, which could be analogized to a multitude of dissimilar state law actions. 107 S.Ct. at 2763.

---

**1.** Only the malpractice count makes reference to the 1985 annual report. The remaining counts are all premised on the alleged inaccuracies in the 1983 and 1984 reports.

**2.** This results in a limitations period of one year after the plaintiff discovers the facts constituting the violation and, in any event, no more than three years after the violation occurred.

However, the Court noted that the civil action provisions of RICO had been modeled after the major antitrust statute, the Clayton Act. Similarities of purpose and structure made the Clayton Act a far closer analogy to RICO than any state law. 107 S.Ct. at 2764–65. The Court also found that application of the limitations period of the Clayton Act was justified by the federal policies at stake and the practicalities of litigation because RICO cases commonly involve interstate transactions and short state statutes of limitation would frustrate Congress' desire to provide an effective private remedy of racketeering. 107 S.Ct. at 2766. Finally, the Court analyzed whether Congress' failure to enact an express limitations period could be read as rejecting a uniform federal statute of limitations and decided it did not. 107 S.Ct. at 2766–67.

As was true with RICO, the law concerning the limitations period applicable to section 10(b) is vexingly uncertain. *See Norris v. Wirtz,* 818 F.2d 1329, 1332 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 329, 98 L.Ed.2d 356 (1987); L. Loss, *Fundamentals of Securities Regulation,* 994–96 (1988); *Report of the Task Force on Statute of Limitations for Implied Actions,* 41 Bus.Law. 645 (1986). The potentially analogous state statutes are many, "with variations for different kinds of securities offenses and different circumstances that might toll the period of limitations." *Norris,* 818 F.2d at 1332.

*The Data Access Decision*

The law concerning the limitations period under section 10(b) was particularly confused in the Third Circuit prior to the *Data Access* decision. Under the law prevailing at that time, the appropriate limitations period for any given 10(b) claim could be determined only by examining the complaint "with great particularity to determine whether the state blue sky statute tracks the particular federal claim, and if not, to determine claim-by-claim which other state limitations period will apply depending upon the resemblance between the

precise federal claim and those based in state or common law actions." *Data Access,* 843 F.2d at 1541. Under this approach, no uniform statute of limitations existed even for section 10(b) cases within the same state. *Id.* Sitting *en banc* in order to reexamine the decisions which created this mess, the court of appeals found "guidance, or at least a strong signal," in *Malley-Duff. Id.* at 1548.

The Third Circuit first decided that, rather than having the limitations period of section 10(b) depend on the particular nature of each claim asserted, a single statute of limitations should apply to all 10(b) claims. 843 F.2d at 1544. The court then used the reasoning of *Malley-Duff* to determine whether the statute of limitations should be borrowed from federal or state law. The court stated the general rule that the limitations period should be borrowed from state law will not hold when "a rule from elsewhere in federal law clearly provides a closer analogy than state statutes, and … the federal policies at stake and the practicalities of litigation make the federal rule a significantly more appropriate vehicle." 843 F.2d at 1545.

Given that the courts, not Congress, had created the private right of action under section 10(b), it seemed to the Third Circuit particularly appropriate to determine the 10(b) limitations period by reference to the body of federal securities law of which section 10(b) was a part. The court viewed the companion provisions of the federal securities law as a much closer analogy to section 10(b) than any state statute. Sections 9(e), and 18(c) and 29(b) of the 1934 Act were considered efforts to remedy the same type of injury in the same manner as section 10(b). 843 F.2d at 1548–49. The limitations period Congress had expressly provided for those provisions was found the best reflection of the "federal policies at stake" and the "practicalities of litigation" in cases under section 10(b). *Id.* Accordingly, the Third Circuit decided to apply the statute of limitations applicable to those companion provisions to section 10(b).

*The Rule in the Eighth Circuit*

The law in the Eighth Circuit is much clearer and more settled than it had been in the Third Circuit prior to *Data Access*. In *Vanderboom v. Sexton*, 422 F.2d 1233, 1237–38 (8th Cir.), *cert. denied*, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970), the court of appeals specified that the statute of limitations applicable to all actions under section 10(b) should be borrowed from "the local statute which bears the closest resemblance to" section 10(b). 422 F.2d at 1237–38. In Minnesota, the application of the three-year statute of limitations set out in Minn.Stat. § 80A.23, subd. 7 has been settled law since *Bailey v. Piper, Jaffray & Hopwood, Inc.*, 414 F.Supp. 475 (D.Minn. 1976).

While the United States Court of Appeals for the Eighth Circuit has not addressed or commented on the limitations period for section 10(b) since either *Malley–Duff* or *Data Access* were decided, the United States Court of Appeals for the Eleventh Circuit has done so. As in the Eighth Circuit, the rule in the Eleventh Circuit is that the limitations period for all section 10(b) claims is determined by reference to the single most analogous state statute. *Friedlander v. Troutman, Sanders, Lockerman & Ashmore*, 788 F.2d 1500, 1505 (11th Cir.1986). In an opinion written subsequent to *Data Access*, the Eleventh Circuit has continued to apply that rule. *Durham v. Business Management Associates*, 847 F.2d 1505, 1508 (11th Cir.1988). The *Durham* court cited *Data Access* as a contrary authority, but did not discuss the conflict or use *Durham* as an opportunity to reconsider its rule.

*Arthur Young's Motion*

■ Arthur Young requests that the Court either decide this motion contrary to *Vanderboom*, or certify the order for interlocutory appeal. *Vanderboom* establishes

clear and settled precedent and, in the Court's opinion, the doctrine of *stare decisis* forecloses a decision in favor of Arthur Young on this motion. The remaining issue is whether the Court should certify the order denying Arthur Young's motion for interlocutory appeal.

■ Section 1292(b) of Title 28 provides a means by which a district court may, in its discretion, certify an order for interlocutory appeal if the order "involves a controlling question of law as to which there is substantial ground for difference of opinion" and "immediate appeal from the order may materially advance the ultimate termination of the litigation." Section 1292(b) is designed to allow for sparing exceptions to the final judgment rule when interlocutory appeal can minimize "the total burdens of litigation on the parties and the judicial system." 16 Wright, Miller, Cooper & Gressman, *Federal Practice and Procedure*, § 3930.

The dispute here is whether an interlocutory appeal would materially advance the ultimate termination of this litigation.[3] On one hand, certification would provide the Eighth Circuit with the opportunity to re-evaluate *Vanderboom* in light of the principles in *Malley–Duff*. If the court of appeals chose to embrace the reasoning in *Data Access*, TCF's section 10(b) action would be barred and its remaining state law claims would be dismissed for lack of subject matter jurisdiction. On the other hand, there is no point to an interlocutory appeal in this case unless *Malley–Duff* makes it probable that the Eighth Circuit will reverse *Vanderboom*. Even then, assuming that *Vanderboom* is reversed, the new rule might not be retroactively applied to TCF. If the rule would not be applied retroactively, nothing will have been accomplished through the interlocutory appeal.

---

**3.** TCF also argues that a substantial ground for difference of opinion cannot exist if there is clear precedent on point within the circuit. This view is too narrow. Certification for interlocutory appeal "might well depend on the presence of arguments not previously considered by the court of appeals, either as presented by later authority or as developed in the district court proceeding." 16 Wright, Miller, Cooper & Gressman, *Federal Practice and Procedure* § 3930.

Thus, to determine whether an interlocutory appeal would materially advance the ultimate termination of this litigation the Court must first decide if it can fairly anticipate a reversal of *Vanderboom* in light of *Malley–Duff.* The Court must also evaluate whether the new rule would apply retroactively.

Clear precedent within the relevant circuit is a strong reason against section 1292(b) certification, although it is not dispositive. 16 Wright, Miller, Cooper & Gressman, *Federal Practice and Procedure,* § 3930. Because under *Vanderboom* the limitations period from the single most analogous state statute in each state is applied to all 10(b) claims, most, if not all, of the problems which the *Data Access* Court addressed do not exist in the Eighth Circuit. Without those problems, nothing compels reconsideration of *Vanderboom* prior to the time the issue is decided by the Supreme Court. Furthermore, it is far from certain that an application of *Malley–Duff* analysis to section 10(b) will lead to the result reached by the Third Circuit. The number of potential statutes within a state that can be borrowed for section 10(b) appears much more limited than the wide range of state statutes covering the predicate acts that can serve to establish racketeering. Perhaps the best indication that *Vanderboom* will not necessarily be overturned after *Malley–Duff* is the fact that the Eleventh Circuit, when presented with the opportunity, failed to follow the Third Circuit and instead continued to apply the same rule now applied in the Eighth Circuit.

Therefore, the Court cannot fairly anticipate that the Eighth Circuit would reverse *Vanderboom* on interlocutory appeal.

Even assuming that the Eighth Circuit did overturn *Vanderboom,* it is still not certain that TCF would be retroactively subject to the newly announced limitations period. As a general rule, judicial decisions do apply retroactively. However, the reliance, purpose and inequity factors discussed in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) may require that a marked change in the law by the courts not be applied retroactively. While the Third Circuit held that the rule in *Data Access* would be applied retroactively in *Hill v. Equitable Trust Co.,* 851 F.2d 691 (3d Cir.1988), that opinion is easily distinguished and may even, as TCF argues, support the argument that in this case any change to the limitations rule should be made prospectively only. As discussed, prior to *Data Access* there was no clear rule in the Third Circuit on the appropriate limitations period for claims under section 10(b). The fact that there was no controlling authority on which the plaintiffs reasonably could have relied figured heavily in the *Hill* decision. 851 F.2d at 696–97. *See Gruber v. Price Waterhouse,* Fed.Sec.L.Rep. par. 94,003 (E.D.Pa. Aug. 28, 1988) (declining to follow *Hill* on the grounds that the limitations period for 10(b) claims brought in Pennsylvania forum was sufficiently settled to be relied upon).

The Court does not conclude that an immediate appeal would advance the ultimate termination of this litigation. Accordingly, based on the foregoing, and on all the files, records, proceedings and arguments of counsel,

IT IS ORDERED that the motion of defendant Arthur Young & Co. for judgment on the pleadings or, in the alternative, for certification permitting interlocutory appeal is denied.