**Carl Anthony MAIO, et al.**

v.

**ADVANCED FILTRATION SYSTEMS, LTD., et al.**

**Civ. A. No. 86–0899.**

United States District Court, E.D. Pennsylvania.

June 17, 1992.

Alexander Kerr, Hoyle, Morris & Kerr, John P. McShea, Philadelphia, Pa., for Maio.

William J. Lehane, Philadelphia, Pa., for Ernst & Whinney.

Vicki M. Cherkas, Norris D. Wolff, Kleinberg, Kaplan, Wolff & Cohen, P.C., New York City, for International Water Sav. Systems, Inc. and Control Fluidics, Inc. and Rudolph L. Biller and Walter O. Heinze.

Roger D. Morris, Morton, Pa., Geoffrey W. Veith, Hecker Brown Sherry & Johnson, Philadelphia, Pa., for Madelon Barnard, Advanced Filtration Systems, Ltd. and C.M. Barnard, Inc.

Norris D. Wolff, Kleinberg, Kaplan, Wolff & Cohen, P.C., for Control Fluidics, Inc., Walter O. Heinze, Rudolph Biller.

David B. Adams, Philadelphia, Pa., and Bruce F. Metge, Mintz, Levin, Cohn, Ferris, Glovsky & Popco, P.C., Edward P. Leibensperger, Nutter, McClennen & Fish, Boston, Mass., for Kennedy and Lehan.

Lillian S. Kachmar, Villanova, Pa., for John F. Steele.

William H. Black, Jr., Philadelphia, Pa., for Niessen, Dunlop & Pritchard.

Richard D. Director, Allentown, Pa., for International Water Sav. Systems, Inc. & Control Fluidics, Inc.

Herbert G. Keene, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for Touche Ross & Co.

Paul Crowley, Philadelphia, Pa., for Advanced Filtration Systems, Ltd., C.M. Barnard, Inc. & Madeline Barnard.

## OPINION

LOUIS H. POLLAK, District Judge.

In 1986, Carl Anthony Maio, William H. Eastburn, III, Thomas F.J. MacAniff, Jordan–Barthmaier Associates, and others initiated a civil action against Advanced Filtration Systems, Ltd., Control Fluidics, Inc., R.L. Biller, Walter O. Heinze, Touche Ross & Co., Niessen, Dunlap & Pritchard, and others. The suit arose from the difficulties that befell Advanced Filtration, a Pennsylvania limited partnership in which the plaintiffs had purchased limited partnership interests in 1981 and 1982. Alleging manifold frauds attendant both on the marketing of the limited partnership interests and on the post-investment management of Advanced Filtration's business, Maio and his co-plaintiffs invoked the Securities Act of 1933, the Securities Exchange Act of 1934, RICO, the Pennsylvania Securities Act, and Pennsylvania common law, in a nine-count complaint. Control Fluidics filed counterclaims.

On November 7, 1988, this court dismissed count two—claims arising under the Exchange Act's § 10(b) and Rule 10b–5—as time barred. Section 10(b) does not in terms create a cause of action: the cause of action is a matter of judicial implication. Accordingly, there is no statutory language establishing a limitation period, and, as a result, formulation of an appropriate limitation period has also been a judicial construct. In a bench opinion concurrent with the November 7, 1988 order, I explained the rationale for dismissal:

The question whether dismissal was mandated turned on the applicability to the Maio amended complaint of *In re Data Access Systems Securities Litigation*, 843 F.2d 1537 (3d Cir.1988), *cert. denied sub. nom. Vitiello v. I. Kahlowsky & Co.*, 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988), an *en banc* decision handed down by the Court of Appeals in the spring of 1988. In *Data Access*, the Court of Appeals determined that the limitation period applicable to § 10(b) claims should be measured by a uniform federal standard rather than—as had theretofore been the prevailing practice in the Third Circuit and most other circuits—by what federal courts deemed to be the most analogous state statute of limitations. The federal standard fashioned by the Third Circuit was modelled on the one-year/three-year limitation period Congress had prescribed in 1934 for most of the private causes of action expressly created by the Exchange Act. Said the court in *Data Access*, "We have decided that the proper period of limitation for a complaint charging violation of section 10(b) and Rule 10b–5 is one year after the plaintiff discovers the facts constituting the violation, and in no event more than three years after such violation." 843 F.2d at 1550. Since the Maio plaintiffs did not commence suit until at least four years after consummation of the allegedly fraudulent sales of limited partnership interests, their § 10(b) claims were barred if *Data Access* was to be given retroactive effect so as to apply to suits begun before *Data Access* was decided—a question the *Data Access* court expressly declined to address.[1] I determined that whether *Data Access* should be so applied depended on the principles of retroactivity announced by the Supreme Court in 1971 in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). Under *Chevron*, retroactive application of a newly announced appellate rule can be avoided only if the new rule is so sharp and unanticipated a break with a well established past rule that the party who would lose under a retroactive application of the new rule could be

---

**1.** In three cases following *Data Access*, the Third Circuit determined that, on the facts there presented, retroactivity was called for. *Hill v. Equitable Trust Co.*, 851 F.2d 691 (3d Cir.1988), *cert. denied*, 488 U.S. 1008, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989); *McCarter v. Mitcham*, 883 F.2d 196 (3d Cir.1989); *Gatto v. Meridian Medi-* *cal Assoc., Inc.*, 882 F.2d 840 (3d Cir.1989), *cert. denied*, 493 U.S. 1080, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990). In a fourth case, *Gruber v. Price Waterhouse*, 911 F.2d 960 (3d Cir.1990), the court agreed with the district court that applying *Data Access* to bar the plaintiffs' claim would be inappropriate.

shown to have had a clear entitlement to rely on the old rule.[2] Examining plaintiffs' claims in the light of *Chevron* I found (1) that, with respect to Pennsylvania § 10(b) claims allegedly accruing in 1981 and 1982, one who contemplated bringing suit had every reason to expect the applicable statute of limitations to be the Pennsylvania limitation period governing common law fraud actions, but (2) whether at that time that limitation period was two years or six years was unsettled. Accordingly, I held that plaintiffs would not have been warranted in assuming that they had more than two years after their purchases of the partnership interests in which to bring a § 10(b) suit. Since the plaintiffs were not entitled to rely on a six-year limitation period, I concluded that, pursuant to *Chevron*, the *Data Access* limitation period should be given retroactive application to their § 10(b) claims. Accordingly, I held that their § 10(b) claims were time barred.

In the ensuing two years and four months, in a series of orders, I granted summary judgment in favor of various defendants on other aspects of plaintiffs' suit. Finally, on March 29, 1991, concluding, pursuant to Federal Rule of Civil Procedure 54(b), that the issues that had been fully determined were separable from other issues relating to other defendants that were not yet determined, I directed the entry of (1) "final judgment in favor of defendants Control Fluidics, Inc., Rudolph Biller, the Estate of Walter O. Heinze, Neissen, Dunlap & Pritchard and Touche Ross & Co. and against plaintiffs with respect to plaintiffs' claims," and (2) "final judgment on the counterclaims of Control Fluidics, Inc. against plaintiffs."

Plaintiffs Maio, Eastburn, MacAniff and Jordan–Barthmaier Associates appealed from the March 29, 1991 order. On June 20, 1991, before the Third Circuit heard argument, the Supreme Court decided *Lampf v. Gilbertson*, —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991).

*Lampf* was a consolidation of two § 10(b) suits, growing out of the purchase of interests in limited partnerships, initiated in the District Court for the District of Oregon in 1986 and 1987. The suits were dismissed by the district court as time barred. Relying on settled Ninth Circuit precedent that the statute of limitations governing § 10(b) claims was that provided by state law for the most analogous state cause of action, the district court determined that under Oregon law the relevant limitation period was for fraud—two years from the date the fraud was, or should reasonably have been, discovered. The partnership interests were purchased in 1979 to 1981. Applying the two-year limitation period, the district court found the suits untimely. The Ninth Circuit reversed, holding that certain material issues of fact with respect to when plaintiffs should have discovered the alleged fraud remained to be explored. The Supreme Court granted certiorari "[i]n view of the divergence of opinion among the Circuits regarding the proper limitations period," 111 S.Ct. at 2777, for § 10(b) suits. The "divergence of opinion among the Circuits" was resolved in favor of a uniform federal standard—an approach taken by seven

---

**2.** Under the *Chevron* principles, the unheralded character of the new rule is a necessary but not a sufficient factor of avoidance of retroactivity. The other relevant factors are: whether retroactive enforcement of the new rule would conduce to effectuate the purposes of the new rule; and whether retroactive enforcement of the new rule would be inequitable—a factor that tends to overlap the question of how unheralded the new rule is. *Chevron*, good law for twenty years, has been thrust into something of a limbo by *James B. Beam Distilling Co. v. Georgia*, —— U.S. ——, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991). The Court's opinion—written by Justice Souter who was joined only by Justice Stevens—announced that: "Once retroactive application is chosen for any assertedly new rule, it is chosen for all others who might seek its prospective application. The applicability of rules of law are [*sic*] not to be switched on and off according to individual hardship...." *Id.* 111 S.Ct. at 2447–48. The opinion declined to "speculate as to the bounds or propriety of pure prospectivity." *Id.* at 2448. Justice Blackmun, in a concurring opinion joined by Justices Marshall and Scalia, stated: "We fulfill our judicial responsibility by requiring retroactive application of each new rule we announce." *Id.* at 2450. Justice White, in a concurring opinion, and Justice O'Connor, in a dissenting opinion joined by the Chief Justice and Justice Kennedy, voiced continuing allegiance to *Chevron*. See note 4, *infra*.

members of the Court. Five of the seven—Justice Blackmun, joined by the Chief Justice and Justices White, Marshall and Scalia—chose the one-year/three-year standard selected by the Third Circuit in *Data Access*. Accordingly, the Ninth Circuit's judgment was reversed, since "there is no dispute that the earliest of plaintiff-respondents' complaints was filed more than three years after petitioner's alleged misrepresentations...." *Id.* at 2782. Justice Kennedy, joined by Justice O'Connor, agreed that it was sensible to have a uniform federal standard but dissented from adoption of the *Data Access* one-year/three-year formulation: the two Justices felt that a one-year/five-year limitations structure would be more conductive to effectuating § 10(b)'s purposes.[3] Moreover, the two Justices, in an opinion by Justice O'Connor, took strong exception to the Court's application of the new rule to bar the plaintiffs' claims: As of the time suit was brought, said Justice O'Connor, "a solid wall of binding Ninth Circuit authority dating back more than thirty years," 111 S.Ct. at 2785, on which plaintiffs placed "entirely proper reliance," *id.* at 2786, dictated that resort should be had to the most analogous state law limitation period. Therefore, under *Chevron* and similar cases, wrote Justice O'Connor, "the federal statute of limitations announced today should not be applied retroactively." *Id.* at 2788. Justice Stevens, joined by Justice Souter, dissented from judicial creation of a federal limitations period for § 10(b) claims after more than forty years of borrowing from state statutes of limitation. Justice Stevens observed that "[t]he policy choices that the Court makes today may well be wise," *id.* at 2785, but "[i]n my opinion the Court has undertaken a lawmaking task that should

properly be performed by Congress." *Id.* at 2783.[4]

On September 4, 1991, the appeals of Messrs. Maio, Eastburn and MacAniff, and Jordan–Barthmaier Associates, from this court's March 29, 1991, order were argued before the Third Circuit. On September 12, 1991, that court, by judgment order,

> ORDERED and ADJUDGED that the judgments of the district court, be and are hereby affirmed. This order is without prejudice to Control Fluidics Inc. making application to the district court for reasonable attorneys fees and costs of collection for this appeal.

None of the *Maio* plaintiffs has petitioned for certiorari to review the decision of the Third Circuit. However, on February 14, 1992, Messrs. Maio, Eastburn and MacAniff, together with Roger F. Barthmaier and Alvin W. Jordan (the principals of Jordan–Barthmaier Associates), "move[d] this Court to reinstate plaintiffs claims under section 10(b) of the Exchange Act and, accordingly, to reverse the court's judgment dismissing those claims." The movants filed an essentially identical motion in the Court of Appeals;[5] that motion was, on March 20, 1991, "denied" without opinion.

The predicate for the motion to reinstate the movants' § 10(b) claims is section 476 of the Federal Deposit Insurance Corporation Improvement Act of 1991, a statute signed into law by the President on December 19, 1991. Section 476 amends the Exchange Act by adding after section 27, 15 U.S.C. § 78aa, a new section 27A, denominated a "Special Provision Relating to Statute of Limitations on Private Causes of Action:"

> Sec. 27A. (a) *Effect on Pending Causes of Action.*—The limitation period

---

**3.** The SEC, as *amicus,* had proposed a two-year/five-year structure.

**4.** *Lampf* was decided on June 20, 1991, the same day that *Beam,* discussed in note 2, *supra,* was decided. The only *Lampf* opinion that mentions *Beam* is Justice O'Connor's dissent: "After *American Trucking [American Trucking Associations, Inc. v. Smith,* 496 U.S. 167, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990) ], the continued vitality of *Chevron Oil* with respect to statutes of limita-

tions is—or should be—irrefutable; nothing in *James B. Beam Distilling Co. v. Georgia* ... alters this fact." 111 S.Ct. at 2787.

**5.** The motion filed in the Court of Appeals was for reinstatement of the § 10(b) claims or, in the alternative, for recall of the mandate and vacation of the September 12, 1991 judgment order.

for any private civil action implied under section 10(b) of this Act that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991.

(b) *Effect on Dismissed Causes of Action.*—Any private civil action implied under section 10(b) of this Act that was commenced on or before June 19, 1991—

"(1) which was dismissed as time barred subsequent to June 19, 1991, and

"(2) which would have been timely filed under the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991,

shall be reinstated on motion by the plaintiff not later than 60 days after the date of enactment of this section.

June 19, 1991, the date which is the fulcrum of the new statutory provision, is the day before *Lampf* was decided. Congress's evident, and avowed, purpose was to withdraw from *Lampf* any retroactive application. Congressman Markey, a principal champion of § 27A, on November 26, 1991 advised his colleagues that the new provision, just agreed upon by a Senate–House conference committee,

rights at least the most egregious wrong of last summer's Supreme Court decisions, Lampf versus Gilbertson. This section would reverse the Court's retroactive application of that decision to dozens of cases brought in the Federal courts by defrauded investors.

.  .  .  .  .

... [W]ith one stroke of the pen last spring, the Supreme Court of the United States plunged a sword directly at the heart of victims of securities fraud....

The language of Section 476 [§ 27A] unambiguously reverses the Lampf ruling's application of the 1–year and 3–year statute of limitations period to thousands of cases which were filed prior to June 19, 1991, and which were pending on that date. Furthermore, it permits

the reinstatement of any suit which may have been dismissed post-Lampf as a result of the Lampf decision.

137 *Cong.Rec.* H 11812–813 (daily ed. Nov. 26, 1991).

The movants perceive the dismissal of their § 10(b) claims as falling exactly within the contours of the new legislation. They posit that so much of the Third Circuit's judgment order of September 12, 1991, affirming this court's March 29, 1991 order, as sustained this court's dismissal of the § 10(b) claims, was based on *Lampf.* In short, the movants contend that their § 10(b) claims were, to use Congressman Markey's formulation, "dismissed post-Lampf as a result of the Lampf decision," and hence should be reinstated.

### I.

Before examining the merits of plaintiffs' contention that the newly-enacted provision of the Exchange Act—§ 27A—mandates reinstatement of their § 10(b) claims, I will address three defense contentions any one of which, if valid, would require denial of plaintiffs' motion without consideration of the applicability of § 27A to this case.

### A. *Is Plaintiffs' Motion Moot?*

In a letter to the court dated April 16, 1992, counsel for defendant Niessen, Dunlap & Pritchard state that, in view of the Court of Appeals' order of March 20, 1992 denying the § 27A motion plaintiffs filed in that court, "we contend that plaintiffs' motion in the District Court is moot."

Plaintiffs' § 27A motion in the Court of Appeals, like plaintiffs' § 27A motion here, was filed in February of 1992, some five months after the Court of Appeals' September 12, 1991 judgment order of affirmance. The motion filed in the Court of Appeals asked that court to reinstate the § 10(b) claims, or, in the alternative, to recall its mandate and vacate the judgment order. The motion was denied without opinion. For this reason one cannot tell whether the denial was a judgment that the motion failed on the merits, *or* was a discretionary

determination that the motion should first be considered by the court of first instance, *or* was a holding that the court lacked jurisdiction after so long an interval since the court's judgment order.[6] Given the very real possibility that the denial was not on the merits, I am not persuaded that the Court of Appeals' action precludes consideration of the motion plaintiffs filed here.

### B. *Is Plaintiffs' Motion Barred by Principles of* Res Judicata?

■ Defendants Control Fluidics, R.L. Biller and Estate of Walter O. Heinze contend that this court's series of orders granting summary judgment on the non-§ 10(b) claims are *res judicata* with respect to the merits of the § 10(b) claims, and hence that the § 10(b) claims would necessarily fail on the merits if they were not time barred.

It is the case that one aspect of plaintiffs' common law fraud claims overlapped plaintiffs' § 10(b) claims. In granting summary judgment with respect to that aspect of the common law fraud claims I summarized the evidence relied on by plaintiffs and then said:

> Accordingly, I conclude that no factfinder could find, by clear and convincing evidence, any of the plaintiffs had been induced to invest in Advanced Filtration on the basis of misrepresentations made by CFI [Control Fluidics] or Mr. Biller or Mr. Heinze. For that reason, I grant and direct that summary judgment be granted with respect to the first aspect of the common law fraud claim.

Transcript of April 4, 1990, p. 18.

The essential congruence of the facts underpinning the § 10(b) claims and the first aspect of the common law fraud claims does not, however, signify that the grant of summary judgment with respect to the common law fraud claims would have mandated a similar grant of summary judgment with respect to the § 10(b) claims had they not been found time barred. The

common law fraud claims were measured by a "clear and convincing evidence" standard. The proof required to establish a § 10(b) claim is measured by the less demanding preponderance-of-the-evidence standard. The Court made the distinction abundantly clear almost twenty years ago, in *Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). There, the Court observed, "the Court of Appeals ... held that plaintiffs in a § 10(b) suit must establish their case by clear and convincing evidence. The Court of Appeals relied primarily on the traditional use of a higher burden of proof in civil fraud actions at common law." 459 U.S. at 388, 103 S.Ct. at 690. But the Court noted that "[r]eference to common-law practices can be misleading ... since the historical considerations underlying the imposition of a higher standard of proof have questionable pertinence here.... Indeed, an important purpose of the federal securities laws was to rectify perceived deficiencies in the available common-law protections by establishing higher standards of conduct in the securities industry.... We therefore find reference to the common law in this instance unavailing." *Id.* at 388–89, 103 S.Ct. at 690–91. Working from these premises, the Court went on to point out that:

> A preponderance of the evidence standard allows both parties to "share the risk of error in roughly equal fashion...." Any other standard expresses a preference for one side's interests. The balance of interests in this case warrants use of the preponderance standard.... The interests of defendants in a securities case do not differ qualitatively from the interests of defendants sued for violations of other federal statutes such as the antitrust or civil rights laws, for which proof by a preponderance of the evidence suffices. On the other hand, the interests of plaintiffs in such suits are significant. Defrauded investors are among the very individuals Con-

---

**6.** The fact that the motion was "denied" rather than "dismissed" somewhat counsels against interpreting the court's action as jurisdictional. On the other hand, given that the denial was the action of a three-judge panel, it is possible that the judges, while unanimous in denying the motion, entertained differing reasons for arriving at a common result.

gress sought to protect in the securities laws. If they prove that it is more likely than not that they were defrauded, they should recover.

We therefore decline to depart from the preponderance-of-the-evidence standard generally applicable in civil actions. *Id.* at 390, 103 S.Ct. at 691.

Given the significantly lower standard of proof governing a § 10(b) claim, my grant of summary judgment with respect to the first aspect of plaintiffs' common law fraud claims could not properly be given *res judicata* effect with respect to plaintiffs' § 10(b) claims.

### C. *Is § 27A Unconstitutional?*

Section 27A undertakes to do two things:

*First:* Subsection (a) of § 27A specifies that the limitation period governing a § 10(b) suit "commenced on or before June 19, 1991"—i.e., commenced the day before *Lampf* was decided—is the § 10(b) limitation period "provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991." In short, subsection (a) is a directive to the federal courts that, in assessing the timeliness of § 10(b) suits filed pre-*Lampf,* they are to disregard the *Lampf*-fashioned limitation period and be guided, instead, by whatever timeliness rules were applicable in the relevant jurisdiction just prior to the decision in *Lampf.* The provision owes its genesis to Congress' unhappiness with *Lampf: Lampf*'s uniform federal one-year/three-year limitation period was seen as likely to result in the dismissal as untimely—and, hence, with no opportunity to establish the merits—of large numbers of § 10(b) suits filed in reliance on more generous limitation periods prevailing in several circuits.

*Second:* Subsection (b) of § 27A complements subsection (a) by providing for the reinstatement, on motion made no more than sixty days after § 27A's enactment—i.e., by February 18, 1992—of any § 10(b) suit (1) filed before *Lampf,* and (2) timely as the law of the relevant jurisdiction stood on the day before *Lampf,* but (3) dismissed as untimely subsequent to (and presumably on account of) *Lampf.* Subsection (b) was intended to assimilate to the general principle declared in subsection (a) the treatment of whatever pre-*Lampf* § 10(b) cases might have been dismissed as untimely on the authority of *Lampf* in the six months between the decision in *Lampf* and the enactment of § 27A.

■ Touche Ross contends that § 27A breaches the constitutionally guaranteed separation of powers and also contravenes equal protection principles implicit in the Fifth Amendment.

In invoking separation of powers doctrine, Touche Ross argues that § 27A constitutes a legislative directive to the judicial branch to disregard authoritative Supreme Court precedent—namely, *Lampf,* bolstered by the new retroactivity rules announced on the same day in *James B. Beam Distilling v. Georgia,* — U.S. —, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991).[7] Such a directive, it is argued, is a usurpation of the judicial power.

It is, of course, fundamental that it "is, emphatically the province and duty of the judicial department, to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). When a dispute goes to court, the judge fulfills Marshall's celebrated dictum by interpreting any assertedly relevant statutory or constitutional provision and also by saying what the interstitial, judge-made, law is in those instances in which statutory or constitutional texts are not controlling. A § 10(b) claim is itself a creation of this process—a cause of action fashioned by the judiciary to carry out the purposes of a statute that mentioned no such cause of action. *Lampf* is a further manifestation of the same process—a judicially ordained limitation period crafted by a majority of the Court to carry out their perception of the goals of the cause of action earlier judges had created.

A § 10(b) claim is, however, an off-shoot of a statute—a complex legislative endeav-

---

7. See notes 2 and 4 *supra.*

or launched by Congress almost sixty years ago and monitored, and amended, by Congress thereafter. Congress' superintendence, and occasional modification, of the Exchange Act reflects the fact that the shaping of "what the law is" is an interactive process in which the legislative and judicial branches have complementary roles. When Congress thinks the law as said by the courts—whether by interpretation of what an earlier Congress wrote or by implication where Congress never wrote—is less than optimal, Congress, as a general matter, has authority to rearrange the law by revising an existing statute or writing a new one.

Among the multitude of things all legislatures, Congress included, can rearrange are statutes of limitations. And such rearrangements can, and indeed commonly do, have impact on pending cases. For example, when the Pennsylvania Legislature, in 1976, massively redesigned its statute-of-limitations apparatus in a statute that was to take effect in 1978, the Legislature also provided that:

(a) Any civil action or proceeding:

(1) the time heretofore limited by statute for the commencement of which is reduced by any provision of this act; and

(2) which is not fully barred by statute on the day prior to the effective date of this act;

may be commenced within one year after the effective date of this act, or within the period heretofore limited by statute, whichever is less ...

Act of July 9, 1976, P.L. 586, No. 142 § 25(a).

If a legislature can, with retrospective effect, alter limitation periods established by earlier statutes, and if, as in *Lampf*, an appellate court can, with retrospective effect, jettison limitation periods established by lower courts and long relied on, it is hard to see what principle of judicial suzerainty should insulate a *judicially* established limitation period from retrospective *legislative* alteration, as in subsection (a) of § 27A.[8]

The separation of powers argument has somewhat more plausibility to the extent that it targets subsection (b) of § 27A—the provision for reinstatement of pre-*Lampf* § 10(b) suits dismissed as time barred after *Lampf*. Legislative resuscitation of a dismissed claim is said by Touche Ross to contravene principles authoritatively laid down by Chief Justice Chase one-hundred-and-twenty-years ago, in *United States v. Klein*, 80 U.S. (13 Wall.) 128, 146, 20 L.Ed. 519 (1871), in invalidating a statute depriving the Supreme Court and the Court of Claims of jurisdiction over post-Civil War claims brought by pardoned Southerners to recover property seized by the Union Army: "The court is required to ascertain the existence of certain facts and thereupon to declare that its jurisdiction on appeal has ceased, by dismissing the bill. What is this but to prescribe a rule for the decision of a cause in a particular way?" Professor Tribe has shown that *Klein*, which "arose in the cockpit of Reconstruction politics," L. Tribe, *American Constitutional Law* (2d ed. 1988) 50, is a case whose rhetoric must be parsed in the light of its particular facts.[9] What *Klein* illustrates, in Profes-

**8.** In his dissent, in *Lampf*, Justice Stevens took occasion to note that the revision of limitation periods, with some measure of retroactive effect, is a task legislatures are better suited to than courts:

> When a legislature enacts a new rule of law governing the timeliness of legal action, it can—and usually does—specify the effective date of the rule and determine the extent to which it shall apply to pending claims.... When the Court ventures into this lawmaking arena, however, it inevitably raises questions concerning the retroactivity of its new rule that are difficult and arguably inconsistent with the neutral, non-policy making role of

the judge. See *Chevron Oil Co. v. Hudson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971); *In re Data Access*, 843 F.2d, at 1551 (Seitz J., dissenting).
111 S.Ct. at 2784.

**9.** Professor Tribe has summarized *Klein* as follows:

> By issuing a general pardon in 1868, President Johnson, among other things, made it possible for former adherents of the Confederacy to file claims with the federal government under a statute which authorized loyal citizens to obtain compensation for property abandoned to federal troops during the Civil War. Congress, not wishing to repeal the

sor Tribe's view, is the proposition that "the separation of powers does limit congressional regulation of the decision-making processes of Article III courts at least this much: if Congress does not purport to alter the government procedural and substantive law, Congress cannot force its interpretation of that law upon the federal courts in particular cases." *L. Tribe, supra,* at 50. In support of his analysis, Professor Tribe has pointed out that Chief Justice Chase was at pains to contrast the legislative intervention affecting *Klein* with the legislative intervention that affected *Pennsylvania v. Wheeling & Belmont Bridge Co.,* 54 U.S. (13 How.) 518, 14 L.Ed. 249 (1851); 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1855), protracted litigation that had heavily engaged the Court's attention in the early and middle 1850s. "In that case," said Chief Justice Chase:

> after a decree in this court that the bridge, in the then state of the law, was a nuisance and must be abated as such, Congress passed an act legalizing the structure and making it a post-road; and the court, on a motion for process to enforce the decree, held that the bridge had ceased to be a nuisance by the exercise of the constitutional powers of Congress, and denied the motion. No arbitrary rule of decision was prescribed in that case, but the court was left to apply its ordinary rules to the new circumstances created by the act. In the case before us no new circumstances have been created by legislation. But the court is forbidden to give the effect to evidence which, in its own judgment, such evidence should have, and is directed to give it an effect precisely contrary.

We must think that Congress has inadvertently passed the limit which sepa-

rates the legislative from the judicial power.

*Klein,* 80 U.S. (13 Wall.) at 146–47. But compare *Ex parte McCardle,* 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1869).

In enacting § 27A Congress has indeed, in Professor Tribe's words, "purport[ed] to alter the governing procedural ... law"— namely, the limitation period applicable to § 10(b) cases filed before a certain date that had not been dismissed as of that date. Congress has done that by, in subsection (a) of § 27A, restoring the "governing procedural ... law" to the heterogeneity (different from circuit to circuit, and in some circuits from state to state) that characterized it before the Court, in *Lampf,* imposed what Congress evidently regards as an overly restrictive uniform rule. Further, in subsection (b), Congress, in the interest of equity, has sought to insure that the alteration embodied in subsection (a) will be applied evenhandedly to *all* § 10(b) cases timely filed before *Lampf* and not dismissed as of that date by providing for the restoration to the docket of any such case dismissed as time barred post-*Lampf* and pre-§ 27A.[10] Moreover, subsection (b) of § 27A does not do what Chief Justice Chase condemned in *Klein*—"prescribe a rule for the decision of a cause in a particular way." Subsection (b) of § 27A does not "prescribe a rule for the decision of a cause" at all. It opens courthouse doors that have been shut and thereby provides litigants with an opportunity to resolve their differences on the merits—merits whose ingredients Congress has not altered. In short, as Chief Justice Chase said with respect to *Pennsylvania v. Wheeling & Belmont Bridge Co.,* "the court was left free to apply its ordinary rules to the new circumstances created by

statute but desirous of denying its benefits to unreconstructed southerners, passed legislation which ordered the Court of Claims and the Supreme Court, in applying the statute, to treat the fact that an individual had accepted the pardon as conclusive evidence that the individual had given aid "to the Rebellion," but to ignore the pardon in deciding whether the individual affirmatively satisfied the loyalty requirement. Congress further provided that, on proof of pardon, a court should sum-

marily dismiss for want of jurisdiction. The Supreme Court held the statute unconstitutional.

**10.** I say "post-*Lampf* and pre-§ 27A" because, during the six months from the decision in *Lampf* to the enactment of § 27A, the *Lampf* limitation period was the governing rule in all courts. As of the date § 27A was enacted, the *Lampf* rule was jettisoned and each circuit's rule was restored to health.

the act." In sum, § 27A has not breached the separation of powers.

██ Touche Ross also contends that § 27A violates equal protection principles inherent in the Fifth Amendment. I agree that Fifth Amendment due process embraces principles of equal protection. *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). But I am unable to detect any absence of equal protection in either of the scenarios Touche Ross finds troublesome:

(1) The first scenario Touche Ross envisages is this:

To the extent that Section 27A is read to demand that state statutes of limitation apply to plaintiffs' claims, the statute creates an irrational scheme under which liability depends on when a lawsuit was brought and where the parties reside. These factors bear no rational relation to the goals of the Exchange Act. Under this interpretation of Section 27A, cases commenced after June 19, 1991, will be decided under the one-year/three-year limitations period of *Lampf*, while cases brought on or before June 19, 1991, may be decided based on the limitations periods and principles of retroactivity in effect in the jurisdictions in which the cases are brought. In pre-*Lampf* cases, geography alone will determine the applicable statute of limitations.

Memorandum of Touche Ross, p. 26.

Geography-based disuniformity in federal statutes of limitations has been a feature of the juridical landscape in a variety of contexts for a very long time. In 1983, in *DelCostello v. Teamsters*, 462 U.S. 151, 171, 103 S.Ct. 2281, 2294, 76 L.Ed.2d 476 (1983), the Court—with Justices Stevens and O'Connor dissenting—opted for a federal limitation period, rather than one borrowed from analogous state statutes of limitations, for federal claims asserted by employees charging unions and employers with practices allegedly constituting (a) as to the union, breach of the duty of fair representation, and (b) as to the employer, breach of the collective bargaining agreement. Writing for the Court, Justice Brennan observed:

We stress that our holding today should not be taken as a departure from prior practice in borrowing limitations periods for federal causes of action, in labor law or elsewhere. We do not mean to suggest that federal courts should eschew use of state limitations periods anytime state law fails to provide a perfect analogy. See, e.g., [*United Parcel Service, Inc. v.*] *Mitchell*, 451 U.S. [56] at 61, n. 3 [101 S.Ct. 1559, at 1563, n. 3, 67 L.Ed.2d 732 (1981) ]. On the contrary, as the courts have often discovered, there is not always an obvious state-law choice for application to a given federal cause of action; yet resort to state law remains the norm for borrowing of limitations periods.

462 U.S. at 171, 103 S.Ct. at 2294.

And Justice Stevens, in his dissent in *Lampf*, pointed out that, from the inception of the implied cause of action under § 10(b) of the Exchange Act in *Kardon v. National Gypsum Co.*, 69 F.Supp. 512 (E.D.Pa. 1946) up to the Third Circuit's decision in *Data Access* in 1988, reference to state statutes of limitations had been the established rule for "four decades." 111 S.Ct. at 2784. It is hard to perceive § 27A's reversion to state limitation periods as a congressional denial of equal protection. Perhaps it may be more aptly perceived as an acceptance of federalism.[11]

---

11. Touche Ross challenges § 27A on equal protection grounds "[t]o the extent that Section 27A is read to demand that state statutes of limitations apply ..." For reasons explained in the text at note 15, *infra*, I conclude that for pre-*Lampf* § 10(b) filers § 27A contemplates a mixed economy: state limitation periods in circuits such as the Ninth, where *Lampf* arose, and federal limitation periods in circuits such as the Third, where *Data Access* arose. This may not be an optimal arrangement, but in any given circuit similarly positioned plaintiffs will be subject to the same rules of limitation. This may be untidy, but it is not unconstitutional.

It appears that Congress achieved this untidiness by default. There was support for replacing *Lampf* with a more generous federal standard—the 2–year/5–year limitation period endorsed by the SEC. See note 3, *supra*. But evidently there was not enough support to carry both houses.

(2) Touche Ross's second scenario focuses on the disparate treatment of two hypothetical plaintiffs:

> ... [T]wo Michigan residents could have identical claims under Section 10(b) for securities bought in June of 1986. Yet the one who brought her suit on June 19, 1991, has a six-year limitation period apply to her claim of securities fraud. The Michigan plaintiff, who brings an identical suit one day later, on June 20, 1991, will, however be barred by the one-year/three-year limitations period of *Lampf*. There is simply no principled reason for treating these similarly-situated plaintiffs differently, yet that is what Section 27A demands.

Memorandum of Touche Ross, p. 27.

Touche Ross's concern about the second, time barred, Michigan plaintiff is presented as a challenge to § 27A. But it is not § 27A that has deprived the hypothetical second Michigan plaintiff of an opportunity to have her case tried on the merits. The source of the second Michigan plaintiff's difficulties is *Lampf*—a case which, as I understand its position, Touche Ross, approves of.[12] All that can be laid at the door of § 27A is that it has not undertaken to alleviate the plight of post-*Lampf* filers, the second Michigan plaintiff included. I suppose an argument could be fashioned that § 27A—an act of legislative grace designed to mitigate the rigors of *Lampf*—suffers from the infirmity of underinclusiveness, in that those to whom the statute's benefits do not run may be said to be just as worthy as those gathered to its bosom.[13] "Where a statute is defective

---

**12.** The application of an appellate decision to all cases filed subsequent to the decision (e.g., in the Touche Ross hypothetical, the application of *Lampf* to require the dismissal of the suit of the second Michigan plaintiff) is unexceptional. What, for Justices O'Connor and Kennedy, was problematic with respect to *Lampf* (apart from their disagreement with the Court over what the § 10(b) limitation period ought to be) was the Court's application of the limitation period it adopted to the plaintiff-respondents in that very case—i.e., to litigants who had brought suit long before the decision. Given the solidity of Ninth Circuit precedent that, in the view of the two Justices, gave the plaintiff-respondents abundant reason to feel they were proceeding in timely fashion, Justices O'Connor and Kennedy felt that: "Quite simply, the Court shuts the courthouse door on respondents because they were unable to predict the future." 111 S.Ct. at 2786. On this basis, Justices O'Connor and Kennedy concluded that a proper application of the principles enunciated in *Chevron* and followed in later cases, such as *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987), would dictate that *Lampf* not be applied "in this case." 111 S.Ct. at 2785 (emphasis in original). As Justice O'Connor explained:

> *Chevron Oil* and *Saint Francis College* are based on fundamental notions of justified reliance and due process. They reflect a straight-forward application of an earlier line of cases holding that it violates due process to apply a limitation period retroactively and thereby deprive a party arbitrarily of a right to be heard in court.

*Id.* at 2786.

The *Lampf* majority did not discuss the retroactivity question. They declared that "plaintiff-respondents' claims were untimely." *id.* at 2782, and that "[t]he judgment of the Court of Appeals" (which had reversed the district court's dismissal of the claims and had remanded for further factual inquiry as to the timeliness of the claims) "is reversed." *Id.* at 2783. Accordingly, the majority had no occasion to discuss *Chevron*, let alone address the question of *Chevron*'s apparent impairment by *Beam*, decided the same day as *Lampf*. See notes 2 and 4, *supra*. Conceptually, the due process strictures which Justice O'Connor invoked with respect to radical abbreviation of limitation periods are strictures that are perhaps more pointedly directed at legislatures than at courts. I suggest this because, conceptually, a judicial decision declares what the law has always been, even though many have been unaware of it, while a statute declares what the law will be after its enactment. Compare, in *Beam*, the concurring opinions of Justice Blackmun, 111 S.Ct. at 2449, and Justice Scalia, *id.* at 2450. But there are instances in which the conceptual distinction between judicial and legislative directives may be hard for the general public to appreciate. Courts would do well to heed the music of due process admonitions even when the words may appear to be directed to the legislative branch.

Whatever the equities involved in the application of the *Lampf* rule to the *Lampf* plaintiffs, when I dismissed the § 10(b) claims of Mr. Maio and his fellow plaintiffs in 1988 it was my stated view that—under *Chevron* principles—the retroactive application of *Data Access* so as to bar the § 10(b) claims of those plaintiffs was proper.

**13.** In my judgment, the argument is a very difficult one. The crucial step is to demonstrate that Congress could not have rationally distinguished between pre-*Lampf* and post-*Lampf* filers. But, given that the evident purpose of Congress was to defeat the retroactive applica-

because of underinclusion there exist two remedial alternatives; a court may either declare it a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by exclusion." Concurring opinion of Harlan, J., in *Welsh v. United States*, 398 U.S. 333, 361, 90 S.Ct. 1792, 1807, 26 L.Ed.2d 308 (1970). One may reasonably assume that, if the argument that § 27A is unconstitutionally underinclusive were to strike a responsive judicial chord, the remedy selected would be to broaden the statute rather than to nullify it. But those with standing to make the argument would be the hypothetical second Michigan plaintiff and others similarly situated, not Touche Ross.

## II.

In part I of this opinion I have determined that (1) plaintiffs' motion is not moot, (2) plaintiffs' motion is not barred by *res judicata,* and (3) § 27A, as invoked by plaintiffs, is not unconstitutional. It remains to be considered whether, pursuant to § 27A, plaintiffs are entitled to reinstatement of their § 10(b) claims.

To gain the relief they seek, plaintiffs must demonstrate two things: The first is that their § 10(b) claims were "dismissed as time barred subsequent to June 19, 1991." The second is that their claims "would have been timely filed under the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991."

(1) *Were plaintiffs' § 10(b) claims "dismissed as time barred subsequent to June 19, 1991"?*

■ Plaintiffs contend that the dismissal of their § 10(b) claims should be deemed, for the purposes of § 27A, to have taken place not on November 7, 1988, when I dismissed them, but on September 12, 1991,

when the Court of Appeals affirmed by judgment order a series of dispositive orders I had entered commencing with the order of November 7, 1988. As plaintiffs see the matter, "realistically, the ultimate or final dismissal of plaintiffs' section 10(b) claims occurred *after* June 19, 1991. It is unreasonable to interpret section 27A as applying only to cases disposed of by district courts on the basis of *Lampf.*" Reply Brief of Plaintiffs, p. 10 (emphasis in original).

Plaintiffs also contend that the legislative history supports their construction of the statute. Plaintiffs point to certain observations made on the floor of the House by Congressman Markey, in which, in explaining the intended impact of § 27A, he pointed to *Lampf* itself as a case that § 27A would require reinstatement of. Plaintiffs argue that "[i]f section 27A applies to *Lampf,* an action which must have been dismissed by the district court *before* June 19, 1991, it surely applies to plaintiffs' case." *Ibid* (emphasis in original).

Read in context, Congressman Markey's observations about *Lampf* offer somewhat less support for plaintiffs' position than plaintiffs find there. What Congressman Markey said was this:

As the statute specifically states, its application is to "any private civil action implied under section 10(b)" of the Securities and Exchange Act of 1934 "that was commenced on or before June 19, 1991." For all of those cases, without exception, the applicable limitation period is that "provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991." Thus, this language would apply directly to the case and parties of Lampf versus Gilbertson itself, insofar as that case was a "private civil action implied under section 10(b)" and

tion of *Lampf,* that is a hard demonstration to make. For all that appears, the hypothetical second Michigan plaintiff could have filed suit on June 19, 1991, just as the first plaintiff did. But she elected to wait a day. And she made that election knowing (or at least her attorney

presumably knew) that *Lampf* had been argued and was awaiting decision.

Legislation is largely a matter of line-drawing. When lines are drawn, the grass often look equal-protection greener on the other side.

was "commenced on or before June 19, 1991."

131 *Cong.Rec.* H 11813 (daily ed. Nov. 26, 1991).

It is apparent that Congressman Markey was using *Lampf* as an illustration of a § 10(b) suit begun "on or before June 19, 1991" and timely brought under the law applicable in the relevant jurisdiction as of June 19, 1991. Congressman Markey said nothing about why *Lampf* should be viewed as a cause dismissed as time barred after June 19, 1991.

But let us assume that Congressman Markey intended his observations to cover that aspect as well. It is true that the *Lampf* § 10(b) claims were dismissed as time barred by the district court before the Supreme Court in *Lampf* declared that the claims were time barred. But that does not make *Lampf* congruent with the case at bar. In *Lampf* the district court's order of dismissal was not affirmed by the court of appeals, as the dismissal of the *Maio* plaintiffs' § 10(b) claims was; in *Lampf* the district court's order of dismissal was *set aside* by the court of appeals and the cause remanded for further proceedings. Thus, when *Lampf* came to the Supreme Court, the § 10(b) claims were *undismissed;* and therefore it was the order of the Supreme Court—or, more likely, of the district court *after remand* from the Supreme Court and the court of appeals—that terminated the *Lampf* § 10(b) claims. So *Lampf* can be taken to illustrate a "private civil action implied under section 10(b) ... which was dismissed as time barred subsequent to June 19, 1991." By contrast, in the case at bar the order of dismissal entered by this court on November 7, 1988 has remained in continuous effect; the Court of Appeals judgment order of September 12, 1991 merely served to ratify the district court dismissal of almost three years before. To say that the *Maio* plaintiffs' § 10(b) claims were "dismissed as time barred subsequent to June 19, 1991"

would, in my view, be taking more liberties with statutory language than lies within my authority.

(2) *Were plaintiffs' § 10(b) claims "timely filed under the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991"?*

█ In the preceding paragraphs I have answered in the negative the question whether plaintiffs' § 10(b) claims were "dismissed as time barred subsequent to June 19, 1991." But, with a view to completing analysis of the issues posed by plaintiffs' motion, I will assume *arguendo* that the question should have been answered in the affirmative. On this assumption, I now consider whether plaintiffs have established the second element of their § 27A motion for reinstatement—namely, that their § 10(b) claims were "timely filed under the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991."

The court's order of November 12, 1988, dismissing the § 10(b) claims, determined that as of that date the claims were time barred. As to the timeliness of the claims as of that date, the November 12, 1988 order is both law of the case and *res judicata.* The only supervening legal phenomenon plaintiffs rely on as altering the legal landscape in Pennsylvania as of June 19, 1991, is the Third Circuit's decision in *Gruber v. Price Waterhouse,* 911 F.2d 960 (3d Cir.1990). In my judgment, what was decided in *Gruber* does not undercut my conclusion, explained from the bench on November 7, 1988, that, on *Chevron* principles, *Data Access* should be applied retroactively to plaintiffs' claims and hence that they were time barred.[14]

Plaintiffs also contend that, if I remain persuaded that *Chevron* calls for the retroactive application of *Data Access* to the *Maio* plaintiffs' § 10(b) claims, I "should consider whether section 27A, a clear repu-

---

**14.** *Gruber* dealt with § 10(b) claims that apparently accrued in 1983, after the effective date of the repeal and replacement of the Pennsylvania statutes of limitations in force from 1978–82, the time period within which the *Maio* plain-

tiffs' § 10(b) claims accrued. And *Sharp v. Coopers & Lybrand,* 649 F.2d 175 (3d Cir.1981), on which *Gruber* relied, dealt with § 10(b) claims that apparently accrued in 1971, prior to the 1978–82 time period.

diation of the retroactive application of *Lampf*, suggests that *Data Access*, the holding of which is identical to that in *Lampf*, should be applied prospectively only." Reply Brief of Plaintiffs, p. 12. It is true that "the holding of [*Data Access*] is identical to that in *Lampf*." But what Congress instructed was that with respect to pre-*Lampf* cases, federal courts should disregard *Lampf*; Congress did not say to disregard *Lampf* and also to disregard *Lampf*-like cases previously decided by lower courts. To the contrary, Congress directed that the timeliness of pre-*Lampf* cases was to be determined in accordance with "the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991." And the legislative history of S. 543, one of the bills from which a conference committee cut-and-pasted § 27A, explains that "[i]n determining whether an action would have been timely filed under the laws applicable in the jurisdiction, the United States district courts should look to the limitation period they would have applied on June 19, 1991, whether borrowed from state law or derived from Federal common law." [15] S.Rep. 102–167, Report of the Committee on Banking, Housing, and Urban Affairs to Accompany S. 543 (102d Cong., 1st Sess., Oct. 1, 1991) p. 206. On June 19, 1991—the day before *Lampf* and *Beam* were decided—the § 10(b) limitation period applicable in district courts in Pennsylvania was "derived from Federal common law" embodied in binding Circuit and Supreme Court precedent: *Data Access* and *Chevron.* Those cases, in my judgment, yield the conclusion that plaintiffs' § 10(b) claims were, as of June 19, 1991, time barred.

At bottom, plaintiff's argument for reinstatement of their § 10(b) claims comes down to the proposition "that the problem Congress found with retroactive application of the *Lampf* rule, and remedied in section 27A, is no different from the problem cre-

ated by applying *Data Access* retroactively. The rule of law in *Lampf* and *Data Access* is the same." Reply Brief of Plaintiffs, p. 12. The only difficulty with plaintiffs' argument is that Congress, in its wisdom, passed a law that dealt with *Lampf* but fell short of dealing with *Data Access*. Plaintiffs' remedy lies with Congress, not here.

### III.

Control Fluidics has ornamented its opposition to plaintiffs' reinstatement motion with a motion of its own. Characterizing the moving plaintiffs' reinstatement motion as "absolutely groundless," Brief of Defendants Control Fluidics, et al., p. 13, Control Fluidics contends that the filing of the motion should result in the imposition of sanctions on the movants and on their lawyers. Control Fluidics invokes Rule 11, 28 U.S.C. § 1927,[16] and "the Court's inherent power over attorneys that practice before it." *Id.* at 12. Touche Ross has joined in the motion for sanctions.

In the previous section of this opinion, I have considered plaintiffs' reinstatement motion and have concluded that it should be denied. But, notwithstanding that the motion has not, in the last analysis, seemed to me persuasive, I regard the motion as an arguable one, not a groundless one. Indeed, I would say that on balance plaintiffs' reinstatement motion, though flawed, presents a more coherent legal position than (1) Control Fluidics' contention that plaintiffs' motion is barred by *res judicata* or (2) Touche Ross's contention that § 27A contravenes principles of equal protection.

In the age of Rule 11, lawyers seem to move for sanctions with increasing alacrity. I suggest that a lawyer tempted to seek sanctions with respect to a position advanced by an adversary might, before filing the sanctions motion, find it prudent to ask herself how confident she is that she would not have taken the same position had she been in her adversary's shoes. In the

---

**15.** See note 11, *supra.*

**16.** 28 U.S.C. § 1927 provides:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multi-

plies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

case at bar, I venture to suggest that counsel for Control Fluidics and counsel for Touche Ross, if they had undertaken to imagine themselves to be counsel for plaintiffs, might well have concluded that, as conscientious lawyers, they owed it to Mr. Maio and his colleagues to bring § 27A to the attention of the Third Circuit and the district court and to urge that the § 10(b) claims be revived, even while recognizing that the odds against success were long. There is a lot of room between the legal position that is groundless and the legal position that is on *terra firma*. In that spacious limbo are to be found the legal positions that, while unfamiliar and appearing to cut against the grain, are nonetheless not wholly untenable. Over time, a few of those novel formulations are likely to turn out to be catalysts of new law.

### Conclusion

For the reasons given in this opinion, the order accompanying this opinion will (1) deny the motion of Mr. Maio and his fellow plaintiffs for reinstatement of their § 10(b) claims, and (2) also deny the motions of Control Fluidics and Touche Ross for sanctions against the plaintiff-movants and their counsel.[17]

### ORDER

For the reasons given in the accompanying opinion:

1. The motion of Carl Anthony Maio, William H. Eastburn, III, Thomas F.J. MacAniff, Roger F. Barthmaier and Alvin W. Jordan for reinstatement of their § 10(b) claims is DENIED.

2. The motions of Control Fluidics and Touche Ross for sanctions are DENIED.

3. The motion of Control Fluidics for an award of attorneys' fees in the amount of $23,426.20 and costs in the amount of $302 incurred in connection with the appeal decided by the Court of Appeals on September 12, 1991 is GRANTED IN PART: Control Fluidics is declared entitled to reasonable attorneys' fees and costs incurred in connection with the appeal in which they were a prevailing party. With a view to reaching agreement on the exact amount owing, counsel for Messrs. Maio, Eastburn, MacAniff, Barthmaier and Jordan and counsel for Control Fluidics will meet forthwith and will, no later than July 1, 1992, submit a joint report to the court on their progress.

---

**17.** Mention should be made of a third motion. In the judgment order of September 12, 1991, the Court of Appeals stated that its affirmance was "without prejudice to Control Fluidics, Inc. making application to the district court for reasonable attorneys fees and costs of collection for this appeal." Accordingly, Control Fluidics, having prevailed on its counterclaims on promissory notes that included costs of collection, has moved in this court for an award of $23,426.20 in attorneys' fees and $302 in costs. Plaintiffs' response contends that (1) Control Fluidics' motion is premature due to the pendency of plaintiffs' motion to reinstate the § 10(b) claims, and (2) Control Fluidics' specifi-

cation of how the claimed totals were arrived at is not sufficiently precise and not adequately documented.

The prematurity argument disappears with the denial of the reinstatement motion. Control Fluidics is entitled to reasonable attorneys' fees and costs; the only question is how much. The parties ought to be able to resolve this modest dispute among themselves. The order accompanying this opinion will declare Control Fluidics' entitlement to fees and costs and will direct counsel for the plaintiffs and counsel for Control Fluidics to meet together with a view to prompt resolution of their differences. If the parties cannot settle the matter promptly, I will.