Elizabeth HANSEN

v.

**SHEARSON/AMERICAN EXPRESS, INC., et al.**

William L. GUPTILL

v.

**C. Joseph MANFREDO.**

Civ. A. No. 82–4945.

United States District Court, E.D. Pennsylvania.

June 7, 1995.

William J. O'Brien, Conrad, O'Brien, Gellman & Rohn, P.C., Philadelphia, PA, for Elisabeth Hansen.

Robert L. Pratter, Philadelphia, PA, for Shearson/American Exp., Inc.

C. Joseph Manfredo, Westport, CT, pro se, and Walter M. Phillips, Jr., Phillips and Phelan, Philadelphia, PA, and Mitchell L. Paul, Paul and Miller, P.C., Philadelphia, PA, for C. Joseph Manfredo.

S. Paul Palmer, Danbury, CT, pro se.

Gregory M. Harvey, Jacqueline V. Prior, Elizabeth H. Fay, Morgan, Lewis & Bockius, Philadelphia, PA, for Arthur L. Guptill.

Richard J. Pautler, St. Louis, MO, Thomas J. Rueter, Philadelphia, PA, and Richard P. Sher, St. Louis, MO, for A.G. Edwards and Sons, Inc.

## MEMORANDUM

LOUIS H. POLLAK, District Judge.

Nearly twelve years ago—on July 1, 1983—Arthur L. Guptill Jr., who had been brought into this action as a third-party defendant, filed claims against C. Joseph Manfredo, a defendant in the original action. All of the other claims in this suit were settled a decade ago, leaving only the claims by William L. Guptill—who, as personal representative of his father's estate, was substituted as the plaintiff [1] subsequent to the death of his father in 1992—against Manfredo.

Trial in this case has been repeatedly delayed by, *inter alia*, attempts to settle the dispute, a bankruptcy filing by Manfredo, a two-year lapse between the time the plaintiff obtained relief from the automatic bankruptcy stay and the time this court was notified that the stay was no longer in effect, the state of Manfredo's health (which precluded trial during the past winter), and, most recently, the retention by Manfredo (who had been proceeding *pro se* since 1984) of counsel. Trial is now scheduled to begin June 19, 1995, and, in anticipation of that trial, Manfredo's recently-retained counsel has filed a motion for partial summary judgment.

The claims in this suit arise under the federal securities laws and the common law of fraud, embezzlement, and breach of fiduciary duty. The motion for partial summary judgment raises three arguments: (1) that a release signed by Arthur Guptill on August 4, 1981, bars all of these claims, except those made in connection with Arthur Guptill's account at A.G. Edwards & Son; (2) that the statute of limitations bars the claims under § 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, that accrued prior to July 1, 1982—a year before Arthur Guptill filed claims against Manfredo (or, alternatively, those that accrued prior to July 1, 1980—three years before Arthur Guptill's filing); and (3) that the statute of limitations governing claims for common-law fraud bars those claims that accrued prior to July 1,

---

1. The question of what labels to attach to the claims and parties in this action is a difficult one. As was outlined in an earlier Memorandum, the claims cannot be properly labeled as "counterclaims" or as "crossclaims." *Hansen v. Shearson/American Express, Inc.,* 116 F.R.D. 246 (E.D.Pa.1987). It follows, then, that the claim-ant cannot properly be labeled "crossclaim-plaintiff" or "counterclaim-plaintiff." For purposes of this Memorandum, and because, at this stage of the litigation, there is little likelihood of confusion, William Guptill (or "Guptill") will be referred to simply as the plaintiff, and Manfredo as the defendant.

1980—three years before Arthur Guptill's filing.[2]

## BACKGROUND

These claims arise out of financial transactions involving Arthur L. Guptill Jr. and C. Joseph Manfredo. Manfredo was, according to the plaintiff's supplemental pretrial memorandum, Arthur Guptill's investment adviser and broker. Manfredo—who was employed first at Shearson/American Express, Inc., and later at A.G. Edwards & Sons, Inc.—was Arthur Guptill's broker, but, in addition, Manfredo advised Arthur Guptill regarding investments in enterprises that were unrelated to either Shearson or A.G. Edwards. Their broker-client relationship began in 1977, and the events at issue occurred "[d]uring the period from approximately 1977 through 1982." Answer of Third–Party Defendant Arthur L. Guptill, Jr. to Third Party Complaint of Shearson/American Express, Inc., with Counterclaims and Crossclaims Against Shearson/American Express, Inc., C. Joseph Manfredo and A.G. Edwards & Sons, Inc. ¶ 30.

The claims that continue to be pressed in this action, see supra n. 2, include claims under § 10(b) of the 1934 Act (and Rule 10b–5), as well as claims of common-law fraud, embezzlement, and breach of fiduciary duty. The defenses asserted are the August 4, 1981, release and the statute of limitations. See Answer and Special Defense of Defendant, C. Joseph Manfredo to Cross-claims of Arthur L. Guptill, Jr. Against Shearson/American Express, Inc., A.G. Edwards & Sons, Inc., and C. Joseph Manfredo, at 8 ("The Plaintiff's claims are barred by the applicable statutes of limitations. . . .").

## THE STATUTE OF LIMITATIONS AND § 10(b)

Easily the most complex issue raised by defendant's motion is the effect of the statute of limitations on the plaintiff's claims under § 10(b) of the 1934 Act. The complexity stems from the fact that (1) because causes of action under § 10(b) have been implied by the courts, it was left to the courts to discern what limitations period to apply, and (2) significant judicial and legislative developments regarding the applicable statute of limitations have occurred in the last decade. The judicial developments involve decisions by (1) the Third Circuit beginning with *In re Data Access Systems Securities Litigation*, 843 F.2d 1537 (3d Cir.) (in banc), *cert. denied*, 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988), and (2) the Supreme Court, most particularly *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), and *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), both of which were decided on June 20, 1991. The legislative development is Congress's reaction to the Supreme Court's decisions of June 20, 1991—that is, § 476 of the Federal Deposit Insurance Corporation Improvement Act of 1991, 105 Stat. 2236, which has been codified at 15 U.S.C. § 78aa–1. In order to determine the effect of the statute of limitations on Guptill's claims, it is first necessary to trace these developments in some detail, beginning with the Supreme Court's decisions of June 20, 1991.

In *Lampf*, the Supreme Court attempted to decide, once and for all, what limitations period governs actions under § 10(b). There

---

**2.** The defendant also argues that the plaintiff's claims for violations of the Commodities Exchange Act, 7 U.S.C. §§ 1–26, which occurred prior to July 1, 1982, are time-barred. Although such claims were made in the plaintiff's filing of July 1, 1983—along with, *inter alia,* claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968—the plaintiff appears to have dropped those claims. The plaintiff expressly stated that the RICO claims were not going to be pursued at trial, see Supplemental Pretrial Memorandum of Cross–Claim Plaintiff William L. Guptill, Personal Representative of Arthur L. Guptill, Jr., Deceased, at 8 ("Guptill presently intends to proceed on the federal securities law and ancillary common law fraud and embezzlement claims, but not on federal racketeering claims. . . ."), and he appears to have also dropped the claims under the Commodities Exchange Act. The Supplemental Pretrial Memorandum only mentions "claims under the federal securities laws," *id.* at 1, and the proposed points for charge submitted by the plaintiff do not include instructions on the alleged violations of the Commodities Exchange Act. Accordingly, I will not address the defendant's argument regarding the application of the statute of limitations to those alleged violations.

the Court "held that 'litigation instituted pursuant to § 10(b) and Rule 10b–5 ... must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation.'" *Plaut v. Spendthrift Farm, Inc.*, —— U.S. ——, ——, 115 S.Ct. 1447, 1450, 131 L.Ed.2d 328 (1995) (quoting *Lampf*, 501 U.S. at 364, 111 S.Ct. at 2782–83). The Court "applied that holding to the plaintiff-respondents in *Lampf* itself, found their suit untimely, and reinstated a summary judgment previously entered in favor of the defendant-petitioners." *Id.* In so doing, the Court rejected the argument that principles of equitable tolling—i.e., that the statute of limitations is tolled until the date on which the plaintiff discovered, or with the exercise of reasonable diligence should have discovered, the facts constituting the alleged fraud, *see Biggans v. Bache Halsey Stuart Shields, Inc.*, 638 F.2d 605, 607–08 n. 3 (3d Cir.1980)—could apply to extend the limitations period:

> The 1–year period, by its terms, begins after discovery of the facts constituting the violation, making tolling unnecessary. The 3–year limit is a period of repose inconsistent with tolling.... Because the purpose of the 3–year limitation is clearly to serve as a cutoff, we hold that tolling principles do not apply to that period.

*Lampf*, 501 U.S. at 363, 111 S.Ct. at 2782.

On the same day that *Lampf* was handed down, the Court also decided *Beam*, "in which a majority of the Court held, albeit in different opinions, that a new rule of federal law that is applied to the parties in the case announcing the rule must be applied as well to all cases pending on direct review." *Plaut*, —— U.S. at ——, 115 S.Ct. at 1450. "The joint effect of *Lampf* and *Beam* was to mandate application of the 1–year/3–year limitations period" to actions that were then pending. *Id.*

If, at any time short of six months after *Lampf* was decided, a motion had been filed

in this case to dismiss those of plaintiff's § 10(b) claims that do not satisfy the 1–year/3–year limitations period, the combination of *Lampf* and *Beam* would have required that the motion be granted. *See, e.g., Khindri v. Yogel,* No. 87–6121, 1991 WL 175483, at *3 (E.D.Pa. Sept. 6, 1991) ("because of the Supreme Court's rejection of modified civil prospectivity in *James B. Beam*, this court has no choice but to apply the *Lampf, Pleva* rule in this case"). However, no such motion was filed, and "[o]n December 19, 1991," one day short of six months post-*Lampf*, "the President signed the Federal Deposit Insurance Corporation Improvement Act of 1991, 105 Stat. 2236. Section 476 of the Act—a section that had nothing to do with FDIC improvements—became § 27A of the Securities Exchange Act of 1934, and was later codified as 15 U.S.C. § 78aa–1 (1988 ed., Supp. V)." *Plaut,* —— U.S. at ——, 115 S.Ct. at 1451.

The new § 27A was an attempt by Congress to ameliorate what Congress evidently perceived as the overly harsh impact of *Lampf/Beam*—the anticipated termination, pursuant to the one-year/three-year limitations period announced by the Court in *Lampf* on June 20, 1991, of large numbers of § 10(b) suits initiated in good-faith reliance on limitations rules more generous than the *Lampf* rule that prevailed in several circuits as of June 19, 1991.

■ Section 27A(a)—the only part of § 27A that is relevant to this dispute [3]—provides as follows:

(a) Effect on pending causes of action

The limitation period for any private civil action implied under [§ 10(b) of the 1934 Act] that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991.

---

**3.** Subsection (b) of § 27A, which had the effect of reopening actions that had been dismissed as a result of *Lampf* prior to the date § 27A was signed into law, was declared unconstitutional by the Supreme Court in *Plaut*. Subsection (a) was not at issue in *Plaut*. And no constitutional challenge has been raised to subsection (a) in

this case. But I note, as Justice Stevens stated in his dissent in *Plaut*, that "[t]he courts of appeals have uniformly upheld the constitutionality of that subsection." 115 S.Ct. at 1469 (Stevens, J., dissenting); *see id.* at —— n. 6, 115 S.Ct. at 1469 n. 6 (citing cases from seven courts of appeals).

In short, § 27A(a) directs that a federal court addressing a motion to dismiss a § 10(b) suit on statute-of-limitations grounds is to determine what limitations law—including the pertinent law of retroactivity—governed on June 19, 1991 (the day before *Lampf* was decided) in the circuit in which the federal court sits. In accordance with that directive, I turn now to an examination of the relevant pre-*Lampf* Third Circuit law.

In the early-to-mid-1980s, the law in the Third Circuit on the question of what limitations period applied to actions under § 10(b) could best be described as "in flux." The only consistent theme was that, rather than look to a uniform federal limitations period, district courts were to borrow an analogous state statute of limitations. *See In re National Smelting of New Jersey, Inc. Bondholders' Litig.,* 722 F.Supp. 152, 158 (D.N.J. 1989) ("The law in this circuit was crystal clear prior to *Data Access* insofar as it indicated that district courts were bound to apply the state limitations law most analogous to a particular plaintiff's § 10(b) claim."). The difficulty arose in determining which of a particular state's statutes of limitations should be applied to a given claim. *See Hill v. Equitable Trust Co.,* 851 F.2d 691, 697 (3d Cir.1988) (describing the uncertainty created by *Roberts v. Magnetic Metals Co.,* 611 F.2d 450 (3d Cir.1979), in which the two-judge majority chose the same limitations period but for different reasons, and *Biggans v. Bache Halsey Stuart Shields, Inc.,* 638 F.2d 605 (3d Cir.1980), in which the same two-judge majority applied the common aspects of their differing *Roberts'* analyses), *cert. denied,* 488 U.S. 1008, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989).

The uncertainty that had been created by the lack of a uniform limitations period within the Third Circuit was resolved by the in banc Court of Appeals' decision announced in April 1988, *In re Data Access Systems Securities Litigation,* 843 F.2d 1537 (3d Cir.) (in banc), *cert. denied,* 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988), wherein the Court of Appeals determined that "the proper period of limitations for a complaint charging violation of section 10(b) and Rule 10b–5 is one year after the plaintiff discovers the facts constituting the violation, and in no

event more than three years after such violation." *Id.* at 1550. What the court expressly did not resolve, however, was to what extent its decision applied retroactively. *See id.* at 1551 ("we do not meet the prospectivity issue here").

That issue awaited the Third Circuit's decision in *Hill v. Equitable Trust Co.,* 851 F.2d 691 (3d Cir.1988), *cert. denied,* 488 U.S. 1008, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989), and its subsequent decisions in *Gatto v. Meridian Medical Associates, Inc.,* 882 F.2d 840 (3d Cir.1989), *cert. denied,* 493 U.S. 1080, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990); *McCarter v. Mitcham,* 883 F.2d 196 (3d Cir.1989); *Gruber v. Price Waterhouse,* 911 F.2d 960 (3d Cir.1990); and *Westinghouse Electric Corp. v. Franklin,* 993 F.2d 349 (3d Cir. 1993). Those decisions established as the law of the Third Circuit that the framework for deciding whether to apply *Data Access* to a case *sub judice* was to be found in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). To be sure, *Chevron,* though "good law for twenty years, [was] thrust into something of a limbo by" *Beam. Maio v. Advanced Filtration Systems, Ltd.,* 795 F.Supp. 1364, 1367 n. 2 (E.D.Pa.1992). Nonetheless, by virtue of § 27A(a), *Chevron* governs the retroactivity issue in this case.

▮▮▮ As a "general rule[,] . . . a controversy is to be decided on the law as it exists at the time the . . . court considers the case, although that law may differ from the one in force at the time . . . the events sparking the litigation occurred." *Hill,* 851 F.2d at 695. However, under the law as it applied on June 19, 1991—which is to say, under *Chevron*—there were circumstances under which a particular decision would be applied only prospectively. *Chevron* sets forth three factors to be considered in deciding whether to give a particular decision strictly prospective effect:

> (1) The holding must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed;

(2) The merits and demerits in each case must be weighed by looking to the history of the rule in dispute, its purpose and effect, and whether retrospective operation will further or retard the rule's operation;

(3) Retrospective application must create the risk of producing substantially inequitable results.

*Id.* at 696 (citing *Chevron,* 404 U.S. at 106–07, 92 S.Ct. at 355–56). "Under the *Chevron* principles, the unheralded character of the new rule"—i.e., satisfaction of the first factor—"is a necessary but not a sufficient factor of avoidance of retroactivity." *Maio,* 795 F.Supp. at 1367 n. 2; *see also Gilmore v. Berg,* 807 F.Supp. 1176, 1180–81 (D.N.J.1992) (citing cases). Further, under *Chevron,* the burden is on the party seeking avoidance of retroactivity. *Gilmore v. Berg,* 761 F.Supp. 358, 364 (D.N.J.1991).

In attempting to avoid retroactive application of *Data Access* to this case, the plaintiff does not argue that Arthur Guptill, in waiting to file until July 1, 1983, relied on "a particular limitations period which he expected a federal court sitting in Pennsylvania to apply." Surreply of Cross–Claim Plaintiff in Further Opposition to the Motion for Partial Summary Judgment ("Plaintiff's Surreply") at 1. The plaintiff does argue, however, that the applicable limitations period would be that which Pennsylvania applies to actions for common-law fraud—which, depending on when the claim accrued, is either two years or six years. *See A.J. Cunningham Packing Corp. v. Congress Financial Corp.,* 792 F.2d 330, 332–37 (3d Cir.1986). This argument stems from *Biggans,* in which the Third Circuit held that, in Pennsylvania, claims for churning—which, along with unsuitability, constitute the plaintiff's claims under § 10(b) and Rule 10b–5—are governed by the limitations period for common-law fraud, rather than that which governs actions brought under the state's securities laws.

In 1988, applying the *Chevron* factors to the *Data Access* holding, I ruled that, as of 1982, a plaintiff could reasonably rely on the fact that the Pennsylvania common-law fraud limitations period would be applied to his action against a broker under § 10(b). *See*

*Maio,* 795 F.Supp. at 1367 (describing the earlier, unpublished ruling in *Maio* as holding that, "with respect to Pennsylvania § 10(b) claims allegedly accruing in 1981 and 1982, one who contemplated bringing suit had every reason to expect the applicable statute of limitations to be the Pennsylvania limitations period governing common law fraud actions"). I went on to hold, however, that the lack of certainty regarding the precise limitations period—that is, whether it was two years or six—precluded the plaintiff from relying on any particular limitations period. *Id.* As a consequence, the plaintiff in *Maio* could not, under *Chevron,* avoid retroactive application of the one-year/three-year statute of limitations announced in *Data Access.*

Guptill acknowledges that ruling, but he appears content to limit his reliance to the threshold matter: reliance on either the two-year or six-year limitations period applicable to actions for common-law fraud in Pennsylvania. (Although it is not clear, he might even be content with the one-year limitations period found in *Data Access,* but the three-year prong of that limitations period is, as I shall explain in a moment, something of a problem.) From that platform, he further argues that he could reasonably have relied, in 1983, on application of the doctrine of equitable tolling to whichever limitations period applied. As long as the limitations period was tolled until Arthur Guptill either discovered the fraud or, with reasonable diligence, should have discovered the fraud, plaintiff argues that all of the § 10(b) claims would have been timely under either limitations period. Thus, he contends, the first *Chevron* factor is satisfied.

■ Before addressing the matter of equitable tolling, let me first make clear what limitations period it is that may—if Guptill's argument carries the day—be tolled. The plaintiff cannot point to a specific limitations period on which Arthur Guptill either did rely or might reasonably have relied. As a consequence, the plaintiff cannot—in this respect—satisfy the first *Chevron* factor, and the one-year limitations period announced in *Data Access* must be applied to this case. *Maio,* 795 F.Supp. at 1367. The more diffi-

cult question is whether that one-year limitations period is subject to unlimited equitable tolling, or whether the three-year prong of *Data Access* must be applied to this case as well.

The plaintiff is correct that, prior to the decision in *Data Access*, the doctrine of equitable tolling was applied in this circuit to actions under § 10(b) and Rule 10b–5. *See Biggans*, 638 F.2d at 607–08 n. 3. It seems clear that under *Biggans*, any limitations period which did not include a period of repose (such as the three-year period in the limitations period imposed by *Data Access*) would be subject to equitable tolling. The question which *Biggans* expressly left open was what effect the federal doctrine of equitable tolling would have on an absolute period of repose in a borrowed state statute of limitations. *Biggans* suggested that application of such an absolute cutoff found in a borrowed state-law limitations period might be inconsistent with the federal doctrine of equitable tolling, but it expressly left the question for another day. *Id.*

▉ Although *Data Access* says nothing expressly about the doctrine of equitable tolling, there is no rational way to interpret the three-year prong of a one-year/three-year statute of limitations except as an absolute cutoff. *Cf. Lampf*, 501 U.S. at 363, 111 S.Ct. at 2782. The decisions of district courts in this circuit that have faced this question support the conclusion that, under *Data Access*, the three-year cutoff was absolute. *See, e.g., Carson v. Bazilian*, No. 90–1870, 1990 WL 158648, at *2 (E.D.Pa. Oct. 15, 1990); *Halperin v. Jasper*, 723 F.Supp. 1091, 1094 (E.D.Pa.1989); *Adelaar v. Lauxmont Farms, Inc.*, 695 F.Supp. 821, 824 (M.D.Pa.1988). Similarly, the pre-*Lampf* decision of the Seventh Circuit adopting the *Data Access* approach rejected the notion that equitable tolling could extend the three-year period of repose found in § 13 of the Securities Act of 1933 (which is the source of the one-year/three-year limitations period):

> Courts say that equitable tolling does not apply under § 13, but this is not strictly accurate. It is better to say that equitable tolling and related doctrines do not extend the period of limitations by more than the two-year grace period § 13 allows. Congress did not obliterate these valuable doctrines so much as it set bounds on the length of delay.... Unless the "in no event more than three" language cuts off claims of tolling at three years, ... it serves no purpose at all—what other function could be served by such language in a statute that starts the time on discovery?

*Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385, 1391 (7th Cir.1990) (citations omitted), *cert. denied*, 501 U.S. 1250, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991).

Because *Data Access* effectively precludes the application of equitable tolling beyond three years, Guptill is either bound by the one-year/three-year limitations period or he must establish that, under *Chevron*, the three-year period of repose announced by *Data Access* should not be applied retroactively. The threshold inquiry remains: was the imposition of an absolute three-year cutoff "a new principle of law" as that phrase is used in *Chevron?*

Two district courts in this circuit have addressed that question, and both have answered in the negative. *See Halperin*, 723 F.Supp. at 1094; *Adelaar*, 695 F.Supp. at 824. *Adelaar* acknowledged that a Fifth Circuit decision, *Hudak v. Economic Research Analysts, Inc.*, 499 F.2d 996 (5th Cir.1974), *cert. denied*, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975), had "applied the tolling doctrine to statutes of repose," but went on to state that it had been directed to "no Third Circuit decisions doing the same." 695 F.Supp. at 824. According to *Adelaar*, the closest Third Circuit decision on point was *Biggans*, but the *Adelaar* court considered it decisive that the *Biggans* court had "expressly left open the precise issue of whether the federal equitable tolling doctrine should apply to a borrowed state statute of limitations containing an absolute time period for bringing suit." *Id.*

*Halperin* took a slightly different approach to the question. Rather than concluding—as did *Adelaar*—that there was no clear precedent mandating application of the equitable tolling doctrine prior to *Data Access, Halperin* assumed that such clear past precedent existed. *Halperin* concluded, however,

that—to the extent such clear past precedent did exist—*Data Access* was consistent with that past precedent: "[A]ssuming, as plaintiffs argue, that equitable tolling or the discovery rule represents clear past precedent with respect to securities claims, it is still in effect. At most, *Data Access* imposed a limit on the allowable discovery period." 723 F.Supp. at 1094. The *Halperin* court further concluded, by way of alternative holding, that "[a]lthough the court in *Hill* did not specifically and explicitly examine past precedent in light of whether, prior to *Data Access,* such discovery period was unlimited, its conclusion that past precedent regarding the applicable statute of limitations was unclear sufficiently covers the issue." *Id.*

The plaintiff does not address *Halperin* and *Adelaar* (presumably because Manfredo (1) only looks to *Halperin* for the general proposition that Arthur Guptill "could not possibly have relied on any particular limitations period given that the pre *Data Access* decisions were not in accord," Letter-brief of May 16, 1995, at 1, and (2) does not mention *Adelaar.*) Arguments may be raised against them, however.

*Adelaar* concluded that it was not clear, prior to *Data Access,* that equitable tolling would be applied to borrowed state statutes of limitations applied to claims under § 10(b) or Rule 10b–5. That conclusion is only partially true. It appears clear to me that, pursuant to *Biggans,* equitable tolling doctrines would apply to any borrowed state statute of limitations that did not contain an absolute cutoff—or, to put it another way, that did not include a period of repose. *See* 638 F.2d at 607 n. 3 ("Although state law provides the limitations period, federal law determines when the period commences to run."). What was not clear was whether equitable tolling would apply in the face of an absolute cutoff found in the applicable state statute of limitations. *Id.* So, assuming that there was no such absolute cutoff in any of the potentially applicable statute of limita-

tions, Guptill would appear to have been justified in relying on the application of equitable tolling to whatever statute of limitations applied.

The problem, of course, is with the assumption. Although most of the potentially applicable statutes of limitations did not include an absolute cutoff,[4] one potentially applicable statute does: namely, the statute of limitations found in 70 Pa.Stat.Ann. § 1–504(a), which applies to actions under Pennsylvania's securities laws. Prior to 1986, that statute—which is the alternative limitations period the *Biggans* court considered borrowing—provided for a one-year/three-year limitations period, similar to that adopted by *Data Access* and *Lampf.*[5]

The plaintiff relies on *Biggans* as an answer to the possible application of the limitations period in § 1–504(a) to the § 10(b) claims in this case. *Biggans* was decided in 1980. In *Biggans,* the Court of Appeals held that the common-law fraud limitations period applied to churning actions. Accordingly, the plaintiff contends that Arthur Guptill was entitled to rely on application of that limitations period. The contention echoes a ruling I made in 1988, in one aspect of the long-playing *Maio* litigation: my conclusion was that in 1982 one could reasonably have relied on application of the common-law fraud limitations period to an action for churning, but it was unclear whether that period would have been two years or six. *See* 795 F.Supp. at 1367.

The problem—and, in the end, the very crux of this analysis—is that the Third Circuit, in 1989, spoke directly to the question of whether a litigant bringing a § 10(b) action against a broker could, in 1982 and 1983, have relied on *Biggans* in satisfaction of the first *Chevron* factor. *See McCarter,* 883 F.2d at 202–04. In *McCarter,* the Court of Appeals held that, even though *Biggans* and *Sharp v. Coopers & Lybrand,* 649 F.2d 175 (3d Cir.1981), *cert. denied,* 455 U.S. 938, 102

---

4. For example, neither Pennsylvania's two- or six-year period for common-law fraud nor Connecticut's two-year period—which Guptill suggests might be applied pursuant to 42 Pa.Cons. Stat. § 5521(b), the Pennsylvania statute that indicates when another jurisdiction's limitations

period should be applied to cases brought in Pennsylvania—includes an absolute cutoff.

5. In 1986, the three-year cutoff was changed to four years.

S.Ct. 1427, 71 L.Ed.2d 648 (1982)—which, like *Biggans*, found that the Pennsylvania common-law fraud limitations period governed—"provided a general approach to the issue of what statute of limitations to apply ..., they do not provide clear past precedent on which McCarter could have reasonably relied in delaying the filing of a claim under the federal securities laws." 883 F.2d at 204.

Guptill looks to *Gruber*, the one case—of the five in which the Third Circuit has addressed this issue—in which *Data Access* has not been held to apply retroactively. 911 F.2d at 968–69. *Gruber* involved a claim under § 10(b) against an accounting firm, and the plaintiff argued that he was justified in relying on *Sharp*, which had also involved a claim against an accounting firm. The Court of Appeals agreed that, because the facts of the two cases were so similar, *Sharp* did provide the plaintiff in *Gruber* with a clear past precedent on which he could have reasonably relied. 911 F.2d at 966.

Guptill argues that, just as was the case in *Gruber*, the factual scenario in *Biggans* provided him with a clear past precedent. Writing on a clean slate, I might be inclined to agree, but *Gruber* did not overrule *McCarter*, and *McCarter* held quite clearly that *Biggans* cannot be treated as a clear past precedent in satisfaction of the first *Chevron* factor.

Because in 1983 there was no clear precedent to the contrary, Arthur Guptill could not reasonably have expected that the one-year/three-year limitations period found in § 1–504(a) would not be applied to his claims. Equitable tolling is, of course, inconsistent with the three-year limitations period in § 1–504(a). It was possible in 1983 that a federal court would hold that such an absolute cutoff found in a borrowed state limitations period must give way in the face of the federal equitable tolling doctrine—as was noted in *Biggans*. *See* 638 F.2d at 608 n. 3. Nonetheless, because the *Biggans* court left this question open, no clear precedent existed to suggest that the federal equitable tolling doctrine would necessarily override a period of repose found in a borrowed state statute of limitations. *Cf. Adelaar*, 695 F.Supp. at 824.

In summary, then, because Guptill can point to no clear precedent that (1) would preclude the application of the one-year/three-year limitations period found in § 1–504(a) to his case, or (2) would mandate that any absolute cutoff found in a state limitations period give way to the federal equitable tolling doctrine, he cannot carry his burden in satisfaction of the first *Chevron* factor. For purposes of this case, *Data Access* did not overrule clear past precedent, and so it must be applied retroactively. Plaintiff's claims for violations of § 10(b) or Rule 10b–5 that occurred prior to July 1, 1980—three years before Arthur Guptill filed his § 10(b) claims against Manfredo—are, therefore, time-barred. What remains is to determine when the facts that constitute the alleged violations of § 10(b) were discovered. The relevance of the date of discovery is this: to the extent that the relevant facts were discovered prior to July 1, 1982—one year before Arthur Guptill filed his claims against Manfredo—the claims for violations that occurred before July 1, 1982, would be barred.

Manfredo relies on the fact, supported by deposition testimony given by Arthur Guptill, that Guptill received notice of each transaction on his account as well as monthly statements setting forth the gain or loss on that month's trading. Guptill has given no substantive response to this argument. To the extent he has responded, it is in the context of discussing the statute of limitations applicable to Guptill's common-law claims:

> Given Arthur Guptill's medical conditions and inability to discover Manfredo's fraud—especially in light of Manfredo's undue influence; misrepresentations; manipulation; deception; fraudulent concealment; conversion; misappropriation; and breach of fiduciary duties—this Court could not possibly determine as a matter of law that any portion of the fraud claim is time-barred. At the very least, there are factual issues precluding summary judgment....

Cross–Claim Plaintiff's Memorandum of Law in Opposition to Cross–Claim Defendant's Motion for Partial Summary Judgment, at 12.

Guptill's response, though perhaps rhetorically appealing, does not include references to or copies of any portions of the record that would support the conclusion that Guptill was not aware of "the facts constituting the [alleged] violation," *Data Access,* 843 F.2d at 1550, until after July 1, 1982. The record excerpts provided by Manfredo do provide some support for concluding that Guptill was aware of the predicate facts prior to July 1, 1982—that he was aware of the quantity of the trades being made in his accounts, for example.

Because this issue does not seem to have yet been fully briefed, I believe it would premature to decide the issue on what is before me. If this case were still scheduled to be tried before a jury, I would ask for expedited pretrial briefing on this matter, so that I could determine whether the issue of when Arthur Guptill discovered the predicate facts presents an issue for jury consideration, or whether it should, instead, be decided as a matter of law. Counsel have informed me this very day, however, that the parties have entered into a stipulation to withdraw the jury demand, which means that the case is to be tried to the bench. Given that development, I believe that the remaining issue regarding the date on which the predicate facts were discovered can be addressed as part of the bench trial.

## STATUTE OF LIMITATIONS WITH RESPECT TO THE COMMON-LAW FRAUD CLAIMS

■ The parties do not dispute that, under Connecticut law, the applicable limitations period is three years. Guptill argues that this limitations period should be the subject of equitable tolling or equitable estoppel. Again, the record is incomplete, and so I will also leave this issue for determination as part

of the bench trial to be held later this month.[6]

## THE RELEASE

Finally, there remains the matter of the release. Manfredo argues that a release signed by Arthur Guptill precludes recovery on the bulk of the claims asserted. The plaintiff responds that Arthur Guptill was in no condition to knowingly enter into the release and that, in any event, the inadequacy of the consideration (i.e., a payment of $2500 in exchange for the release of claims potentially worth hundreds of thousands of dollars) alone presents an issue for jury consideration under Connecticut law.

The parties appear to agree on the most difficult issue posed by the release—namely, to which jurisdiction one looks for the governing law. This issue was raised in a memorandum filed by Guptill in April 1992 (in anticipation of the trial date that was postponed by Manfredo's bankruptcy filing). That Connecticut law would govern with respect to release of the common-law fraud claims is a sufficiently easy conclusion to reach upon application of the interests analysis that guides Pennsylvania's choice-of-law law.

The more difficult question involves the release of the federal securities claims. Here Guptill argues that, although federal law controls, federal law will, in this circumstance, look to state law. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728–29, 99 S.Ct. 1448, 1458–59, 59 L.Ed.2d 711 (1979) (describing circumstances under which federal law should be determined by reference to state law); *Three Rivers Motors Co. v. Ford Motor Co.,* 522 F.2d 885, 891–92 (3d Cir.1975) (determining validity of release of antitrust claim under state law). *But see Locafrance*

---

**6.** In this context, I would note that Manfredo has argued that Guptill may not assert the doctrine of equitable estoppel because he failed to plead fraudulent concealment with particularity when these claims were asserted in July 1983. In so arguing, Manfredo relies on my decision in *Alfaro v. E.F. Hutton & Co.,* 606 F.Supp. 1100 (E.D.Pa.1985). There the plaintiffs had pleaded fraudulent concealment in anticipation of a statute-of-limitations defense. They did so without providing the particularity required by Federal

Rule of Civil Procedure 9(b), so I dismissed the relevant count of the complaint, but gave the plaintiffs opportunity to amend. Here, the plaintiff has not anticipated the defense, nor was he obligated to do so. The defendant has not pursued his statute-of-limitations defense until now—long after discovery has closed—and, in this situation, there is no basis for preventing the plaintiff from relying on fraudulent concealment in response to the only recently litigated statute-of-limitations defense.

*U.S. Corp. v. Intermodal Systems Leasing, Inc.,* 558 F.2d 1113, 1115 (2d Cir.1977) (determining validity of release of federal securities claim under federal law). Manfredo does not expressly address the issue, but his arguments rely on the application of Connecticut law to the release of both the federal and state claims.

Although there has been some division among the courts of appeals on the issue of when releases of federal claims are governed by a uniform, federal standard, and when the federal standard should be determined by reference to state law, the Supreme Court's recent decision in *O'Melveny & Myers v. FDIC,* —— U.S. ——, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), and the Third Circuit's yet-more-recent decision in *Beazer East, Inc. v. Mead Corp.,* 34 F.3d 206 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1696, 131 L.Ed.2d 559 (1995), support the view that Connecticut law governs the release of the claims under § 10(b). In *O'Melveny,* the Court rejected the FDIC's argument that the issue in that case—"whether the knowledge of corporate officers acting against the corporation's interest will be imputed to the corporation," —— U.S. at ——, 114 S.Ct. at 2052—should be governed by a uniform, federal rule: "We conclude that this is not one of those extraordinary cases in which the judicial creation of a federal rule of decision is warranted." *Id.* at ——, 114 S.Ct. at 2056. Following *O'Melveny,* the Third Circuit, in *Beazer East,* addressed the construction of indemnification agreements in the context of the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. §§ 9601–9675. Because there was no " ' "significant conflict between some federal policy or interest and the use of state law," ' " 34 F.3d at 214 (quoting *O'Melveny,* —— U.S. at ——, 114 S.Ct. at 2055, which in turn quoted *Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966)), the Court of Appeals held that "state law should determine whether any particular contract of indemnity provision can be construed generally or broadly enough to cover one responsible party's liability to another." *Id.* at 215.

The case at bar does not appear to be a case in which there is any "significant conflict between some federal policy or interest and the use of state law." Accordingly, because of the strong presumption in favor of state law announced in *O'Melveny,* and because of the parties' apparent consensus on this point, I conclude that, for purposes of this case, the validity of the release of the plaintiff's claims under § 10(b) should be determined by reference to Connecticut law.

Given that framework—namely, that Connecticut law governs the release of both the federal and state claims—Guptill is correct in arguing that Connecticut law allows the factfinder to look to the adequacy of the consideration in determining whether the release was obtained by fraud. *See Ross v. Koenig,* 129 Conn. 403, 28 A.2d 875, 877–78 (1942). Accordingly, the validity of the release remains an issue for determination during the bench trial, and, to this extent, Manfredo's motion for partial summary judgment will be denied.